OPINION
{¶ 1} Defendant-appellant Robert Sosnoskie appeals from his conviction and sentence for Second-Degree Murder (the offense occurred in 1971). On appeal he offers four assignments of error. Sosnoskie asserts that the trial court should have suppressed both of his confessions; that his trial counsel was ineffective; and that his conviction is against the manifest weight of the evidence. He then argues that the *Page 2 
cumulative errors denied him a fair trial. We conclude that the confessions were admissible; that Sosnoskie was not denied the effective assistance of counsel; that his conviction is not against the manifest weight of the evidence; and that he was not denied a fair trial. Accordingly, we affirm the judgment of the trial court.
 I {¶ 2} On June 19, 1971, Sosnoskie was selling magazine subscriptions door to door. He came to the home of seventy-six-year-old Perry Smith, who invited him in. Sosnoskie claims that Smith went to his bedroom for money to pay for the subscription that he ordered, but that when Smith returned, he demanded that Sosnoskie leave immediately and threatened to call the police. At first, Sosnoskie claimed that Smith had lunged at him, but he later stated that he was not sure that was true. Sosnoskie grabbed "something" and beat Smith so badly that he was left motionless on the floor where he died. Before he left, Sosnoskie searched Smith's clothing, ripping his pockets, and he tore apart Smith's home in his search for money.
 {¶ 3} Smith sustained numerous injuries, including bruises from his head to his thighs, cuts on his face and head, and swelling to his brain. He also had multiple fractures to his shoulders and ribs and defensive injuries to his arm and hand. The coroner opined that the injuries were caused by blunt-force trauma, and that the injuries could have been caused by a beating with a whetstone that was found next to Smith's body. Smith's death was caused by a heart attack as a direct result of the brutal beating.
 {¶ 4} Retired Major Samuel Mains of the Montgomery County Sheriff's Office *Page 3 
was first on the scene. When he arrived, he found the entire home ransacked. Mains entered through the kitchen, where cabinets were opened, and Smith's belongings were strewn about the floor. In the living room couch cushions had been removed, taken apart, and tossed on the floor. The hallway to the bedroom with also full of Smith's belongings. In the bedroom, every drawer had been opened and dumped out. The mattress was pulled off of the bed, and everything was pushed off of the shelves. In Smith's closet, the clothes rod was out of place, and his clothes had fallen to the floor. Also, the metal duct work running through the top of the closet had been ripped out.
 {¶ 5} Smith's badly beaten body was found amongst his belongings on his bedroom floor. Mains found a handled whetstone laying next to Smith's right leg, which he believed to be the murder weapon, because of its location and the fact that the marks on Smith's t-shirt matched the size and shape of the whetstone.
 {¶ 6} Mains requested the assistance of Ohio Bureau of Criminal Identification (BCI) Agents Stephen Koch and Charles Boynet in investigating the crime. While Koch and Boynet processed the scene, Mains and other officers canvassed the neighborhood. Koch and Boynet recovered seventy latent prints from Smith's home, along with other evidence. Thirty of the prints were found to belong to Smith, but forty were not identified at that time. Because there was no nation-wide automated database of known fingerprints in 1971, there was no way to compare the crime scene prints to any prints other than those of specific suspects or prints held in BCI's own files. Because Sosnoskie's name never came up during the investigation, the case eventually went cold. *Page 4 
 {¶ 7} Detective Ward of the Montgomery County Sheriffs Office was assigned the cold case in 2006. He reviewed all of the evidence and submitted the unidentified latent prints to the Miami Valley Regional Crime Lab to be run through the Automated Fingerprint Identification System (AFIS), a national database of several million fingerprints that was established in 1990. An examiner entered the fourteen clearest prints into the AFIS system. The system matched the two best prints with Sosnoskie. The examiner then obtained a complete set of Sosnoskie's fingerprints and visually compared them to all thirty of the latent prints submitted by Ward. Seventeen were identified as belonging to Sosnoskie.
 {¶ 8} Ward tracked Sosnoskie to a rural part of northern Wisconsin and contacted authorities there to confirm his address. On May 10, 2007 Ward and his partner, Detective Brad Daugherty, traveled to Dunn County, Wisconsin, to interview Sosnoskie. The following morning Ward and Daugherty met with Wisconsin Division of Criminal Investigation Investigator Rob Ebben and Dunn County Sheriffs Office Detective Craig Cozier, and the four made the forty-five minute drive to Sosnoskie's home.
 {¶ 9} Ebben and Cozier went to Sosnoskie's front door, where Ebben identified himself and told Sosnoskie that he had unpaid traffic fines in Nebraska and that he could come to the local sheriff's department to pay his fines. The officers explained that it was strictly voluntary, he was not under arrest, and he could leave at any time. Sosnoskie claimed that he had been trying to take care of the fines and agreed to accompany the officers. Sosnoskie asked them for a ride to and from the station.
 {¶ 10} At the station, Ebben put Sosnoskie in an interview room and told him that *Page 5 
Ward and Daugherty "were investigators here to talk to him about an unrelated matter." Ebben introduced Ward and Daugherty, who gathered Sosnoskie's background information before beginning to interview Sosnoskie about Smith's murder. Because Sosnoskie was not under arrest, the officers did not advise him of his rights under Miranda v.Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Several times during the interview, the officers reminded Sosnoskie that he was not under arrest and that he was free to leave. Sosnoskie was pleasant and cooperative throughout the interview, and he explained what had happened at Smith's home.
 {¶ 11} At the conclusion of the interview, Ebben and Cozier drove Sosnoskie back to his home. The following day Ward and Daugherty arrested Sosnoskie, and began the extradition procedure. Later that month, Daugherty returned to Wisconsin to bring Sosnoskie back to Ohio. Before they began their drive, Daughterty advised Sosnoskie of hisMiranda rights, which he waived. As they drove, Sosnoskie repeated the information that he had already provided, with a few clarifications.
 {¶ 12} In September, 2007, Sosnoskie was indicted on one count of Second-Degree Murder. The following month, he filed a motion to suppress his confessions, which the trial court overruled from the bench, without issuing a written decision. In March, 2008 Sosnoskie was tried by a jury, which found him guilty as charged. The trial court sentenced Sosnoskie to life in prison. Sosnoskie appeals from his conviction and sentence.
 II {¶ 13} Sosnoskie's Second Assignment of Error is as follows: *Page 6 
 {¶ 14} "APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED TO HIM UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION."
 {¶ 15} In his Second Assignment of Error, Sosnoskie alleges numerous instances of ineffective assistance of counsel. He contends that counsel should have sought dismissal of the charges against him for pre-indictment delay, and that counsel should have investigated the circumstances surrounding the destruction of physical evidence. Sosnoskie argues that counsel should have objected to the admission of the crime scene diagram prepared by Major Mains and to opinion testimony of Mains, Agent Koch, and the coroner Dr. Welsh. Finally, Sosnoskie maintains that counsel should have prevented testimony about his "other crimes" and that counsel should have challenged the State's request to declare Dr. Welsh unavailable to testify at trial.
 {¶ 16} In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. Id. Sosnoskie has failed to meet his burden.
 {¶ 17} We begin our analysis with Sosnoskie's argument that trial counsel should have moved for dismissal because pre-indictment delay denied him of his right to due process. Sosnoskie's claims that counsel was ineffective for failing to move for *Page 7 
dismissal due to pre-indictment delay and his concern about the destruction of physical evidence are intertwined and will be discussed together.
 {¶ 18} "An unjustifiable delay between the commission of an offense and a defendant's indictment therefore, which results in actual prejudice to the defendant, is a violation of the right to due process of law." State v. Luck (1984), 15 Ohio St.3d 150, paragraph two of the syllabus. See, also, United States v. Marion (1971), 404 U.S. 307,92 S.Ct. 455, 30 L.Ed.2d 468; United States v. Lovasco (1977),431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752.
 {¶ 19} In order to demonstrate a due process violation, a defendant must show that he has suffered actual, substantial prejudice from the delay that outweighs the State's justifiable reason for that delay.Luck, supra, at 154, citing Lovasco, supra, at 789-90. See, also,State v. Whiting (1998), 84 Ohio St.3d 215. "A delay may be unjustifiable where, for example, it is intentionally undertaken in order to gain some tactical advantage over the defendant, or when the state through negligence has ceased active investigation of a case and then later decides to commence prosecution upon the same evidence that was available to it at the time the investigation ceased." State v.Collins (1997), 118 Ohio App.3d 73, 77, citing Luck, supra, at 158.
 {¶ 20} Sosnoskie argues that he was prejudiced by the pre-indictment delay in two major respects: witnesses either had no independent memory of the events, or their memories were incomplete; and physical evidence had been destroyed. These claims of prejudice must be balanced against the other evidence presented by the State in order to determine actual prejudice. Id. at 76-77, citing Luck, supra, at 154. The other evidence in this case includes Sosnoskie's confessions to beating Smith with some *Page 8 
object, which he could not identify, to the point that he left Smith motionless on the floor, after which he ransacked Smith's home looking for money, and the discovery of Sosnoskie's fingerprints on various items in the home.
 {¶ 21} In a similar case, State v. Stringham, Miami App. No. 2002-CA-9, 2003-Ohio-1100, at ¶ 8, citing Collins, supra, at 76-77, we found no actual prejudice resulting from the loss of hypothetical witnesses, faded memories, and an inability to locate other, unidentified suspects. As in this case, Stringham involved a 30-year delay between the murder and the filing of the indictment, prompted by fingerprint identification through AFIS. Id. at ¶ 3-4. Also like this case, the State's strongest evidence consisted of the defendant's fingerprints and his confession. Id. at ¶ 6. We held, "When Stringham's confession and the government's fingerprint evidence are balanced against his assertion of a faded memory and an inability to locate other unidentified suspects, we find no actual prejudice." Id. at ¶ 8. Similarly, Sosnoskie cannot demonstrate actual prejudice on these grounds.
 {¶ 22} This case differs from Stringham in that Sosnoskie also claims that he suffered actual prejudice as a result of the destruction of physical evidence, including the neighborhood in which Smith lived, and the fingerprinted items removed from the home, including the suspected murder weapon. Although Smith's home and neighborhood no longer existed by the time of trial, Sosnoskie had the same opportunity as the State to conduct an investigation through the review of crime-scene photos, police reports, and witness statements. He has offered nothing more than conjecture that he may have been able to unearth helpful information if he could have talked to people in the neighborhood. *Page 9 
 {¶ 23} As for the whetstone and other items collected as evidence, it is true that those items were destroyed in 1992, more than twenty years after the murder. However, all of the actual fingerprints lifted from those items remained in the file and were capable of being independently examined. Sosnoskie's speculation about what might have happened had those items been preserved does not establish actual prejudice.
 {¶ 24} For the constitutional duty to preserve evidence to arise, "the evidence must possess an exculpatory value that was apparent before it was destroyed, and must also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta (1984), 467 U.S. 479, 488,104 S.Ct. 2528, 81 L.Ed.2d 413. However, when the evidence is only potentially exculpatory, a defendant must demonstrate that the government destroyed the evidence in bad faith. Arizona v.Youngblood (1988), 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281. Bad faith is "something more than bad judgment or negligence. `It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.'" State v. Smith, Montgomery App. No. 20247, 2005-Ohio-1374, ¶ 7, quoting State v. Franklin, Montgomery App. No. 19041, 2002-Ohio-2370, in turn citing State v. Buhrman (Sept. 12, 1997), Greene App. No. 96 CA 145.
 {¶ 25} To say that had the physical evidence been preserved, rather than just photographs of the evidence, it could have revealed additional latent prints, blood, or other forensic evidence, is pure speculation. There was no exculpatory value evident at the time that the evidence was destroyed. Furthermore, Sosnoskie has offered no *Page 10 
evidence of bad faith in the destruction of the evidence. Detective Ward testified that the evidence remained in the property room until 1992, more than twenty years after the murder. He was unaware of the reason for the destruction, but it appears to have been an oversight — negligence, at most.
 {¶ 26} Sosnoskie has failed to establish actual prejudice due to the pre-indictment delay and related destruction of physical evidence. Accordingly, we conclude that trial counsel was not ineffective for electing not to raise these challenges below.
 {¶ 27} Sosnoskie alleges that counsel was ineffective for failing to challenge the admission of the sketched crime-scene diagram drawn by Major Mains. We conclude that there was no basis for challenging the sketch, and that Sosnoskie suffered no prejudice as a result of its introduction.
 {¶ 28} The diagram was relevant; it depicted the bedroom in which Smith's body was found. It illustrated for the jury the relative placement of the evidence gathered from the room, including Smith's body and the whetstone, which may not have been readily apparent from the witness' description of the scene or the crime-scene photographs. The diagram put the room in perspective as a whole, rather than in pieces as offered by individual photos. "Simply put, the diagram was [used] as a demonstrative device to aid the witnesses in describing to the jury where the [crime] took place." State v. Shells, Montgomery App. No. 20802, 2005-Ohio-5787, ¶ 46. See, also, State v. Richardson (June 11, 1943), Montgomery App. No. 1753.
 {¶ 29} Additionally, Sosnoskie contends that trial counsel was ineffective for failing to challenge the opinion testimony of Major Mains and Agent Koch when they opined that Smith's home had been ransacked and that Smith had suffered a violent *Page 11 
death. However, those opinions were "rationally based on the perception of the witness and * * * helpful to a clear understanding of his testimony or a determination of a fact in issue." Evid. R. 701. The investigators agreed that there was no place in the home that was undisturbed. Smith's property was thrown all over the home. Drawers and shelves were emptied; cushions were removed from the couch; the mattress was pulled off of the bedframe; and the duct work was torn out of the closet ceiling. The way the house was ransacked and the fact that Smith's pants pockets were ripped out could lead one to reasonably conclude that the perpetrator was looking for something. The testimony helped to explain the extent of the disarray in which they found the home, which supported Sosnoskie's admission that he ransacked the home looking for money.
 {¶ 30} Mains's testimony that Smith had died a violent death was also rationally based on his perceptions. The coroner testified that Smith was covered with bruises from his head to his thighs. He had marks on his back, and he suffered from several broken bones. In fact, the coroner explained that the severity of the beating caused Smith to suffer a heart attack, which was the direct cause of his death. After having been in law enforcement for more than thirty years and having served two years in Vietnam, Mains had seen enough deaths to know that this one was particularly violent.
 {¶ 31} Furthermore, Mains's testimony helped the jury in determining an ultimate issue of fact, because as part of Murder in the Second Degree, the State had to prove that Sosnoskie purposely and maliciously killed Smith. The number, placement, and extent of Smith's injuries made it more likely that Sosnoskie's specific intent was to kill Smith, not merely to incapacitate him, and that he knew that his actions would produce injury. Both Koch's and Mains's testimony constituted proper opinion testimony by law *Page 12 
enforcement officers, and defense counsel correctly chose not to object.
 {¶ 32} Similarly, Dr. Welsh's opinion that all of Smith's injuries were sustained at the same time was appropriate opinion testimony. Dr. Welsh was the State's medical expert, the man who had actually conducted the autopsy. His opinion was based on his observation of Smith's injuries, informed by his years of experience as a medical doctor with specific expertise in the field of forensic pathology. There was no basis for objection.
 {¶ 33} Next, Sosnoskie insists that counsel should have objected to the admission of other bad acts evidence, namely the Assault and Robbery of Smith. Sosnoskie was charged with Second Degree Murder under former R.C. 2901.05, which requires the State to prove that he purposely and maliciously killed Smith. To prove that Sosnoskie acted maliciously, the State had to prove that he purposely engaged in unlawful conduct and knowingly caused injury to Smith. The State argued that Sosnoskie's unlawful conduct was "the beating death of Perry Smith" and "the subsequent raiding of his residence afterwards." The Assault and Robbery were not other acts, but were evidence of an element of the crime with which Sosnoskie was charged, just as Aggravated Robbery, Rape, and Aggravated Burglary are elements of Aggravated Murder under R.C. 2903.01(B). Furthermore, the evidence would have been admissible as evidence of Sosnoskie's motive — he wanted to rob Smith. Because the State was required to prove unlawful conduct as part of Murder in the Second Degree, counsel properly chose not to file a liminal motion or to object at trial.
 {¶ 34} Finally, Sosnoskie argues that his attorney should have challenged the State's request to declare Dr. Welsh unavailable, under Evid. R. 804(A)(4), and to admit *Page 13 
his deposition testimony under Evid. R. 804(B)(1). Because any challenge by defense counsel would likely have failed, we conclude that counsel's strategy of not challenging the use of Dr. Welsh's deposition at trial was not unreasonable.
 {¶ 35} Pursuant to Crim. R. 15(F), "[a]t the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears * * * that the witness is unable to attend or testify because of sickness or infirmity." A witness is deemed unavailable pursuant to Evid. R. 804(A)(4) when he "is unable to be present or testify at the hearing because of death or then-existing physical or mental illness or infirmity." Once a witness is found to be unavailable, former testimony may be used if the defendant had an opportunity to cross-examine the witness. Evid. R. 804(B)(1). See, also, Crawford v. Washington (2004), 541 U.S.36,124 S.Ct. 1354, 158 L.Ed.2d 177 (prior testimony of a witness is admissible if the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness).
 {¶ 36} The evidence supports the trial court's finding of unavailability. The State requested Dr. Welsh's deposition because he was seventy-eight years old and in such frail health that he was unable to testify before the grand jury and was unlikely to be able to testify at trial. In fact, shortly after his deposition, Dr. Welsh underwent major surgery, from which he was still recovering at the time of trial, which made him even less available to testify than before the deposition was taken.
 {¶ 37} Furthermore, Sosnoskie had ample opportunity to cross-examine Dr. Welsh during the deposition. Although Sosnoskie argues that counsel did not have enough information with which to effectively cross-examine Dr. Welsh, the record shows that counsel had received the discovery packet, including all of the police reports, along *Page 14 
with details of Sosnoskie's confessions, a diagram of the scene, the death certificate, the autopsy report, and two reports from the latent prints examiner. Counsel was also made aware that there was a videotape of Sosnoskie's confession, as well as crime-scene and autopsy photos, available for his inspection and copying. The only evidence not available to counsel at the time of the deposition was additional fingerprint information, none of which was relevant to the cross-examination of the coroner. In fact, defense counsel cross-examined the doctor at some length regarding the cause and time of death, the time of Smith's injuries in relation to death, the cause of the injuries, and whether the injuries could have been aggressive rather than defensive.
 {¶ 38} In any event, even if counsel had successfully challenged the admission of the deposition testimony, the State could have admitted Dr. Welsh's autopsy report, and could have called another medical expert to testify about the findings and conclusions contained therein. State v.Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, ¶¶ 79-80, 88. Counsel may well have decided that his cross-examination of the original coroner would carry more weight with the jury than the cross-examination of someone who was simply the messenger.
 {¶ 39} Because Dr. Welsh was unavailable to testify at trial due to his poor health, and defense counsel was able to cross-examine Dr. Welsh at the deposition, his deposition was admissible in place of his testimony at trial, and we do not fault counsel's decision not to challenge its admission
 {¶ 40} For these reasons, we conclude that Sosnoskie was effectively represented by his trial counsel. His Second Assignment of Error is overruled. *Page 15 
 III {¶ 41} Sosnoskie's First Assignment of Error is as follows:
 {¶ 42} "THE TRIAL COURT ERRED IN FAILING TO EXCLUDE EVIDENCE GAINED AGAINST APPELLANT IN VIOLATION OF HIS RIGHTS PURSUANT TO THE FOURTH,FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. APPELLANT RECEIVED SUPPRESSION-RELATED INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 43} In his First Assignment of Error, Sosnoskie argues that the trial court should have suppressed both of his confessions because the first one was made without the benefit of Miranda warnings, and the second confession was tainted by the circumstances under which the first was given. He also claims that trial counsel was ineffective for failing to more clearly object to the admission of the second confession and for failing to address the lack of a written decision from the trial court on his motion to suppress. We conclude that the confessions were both admissible and that trial counsel was not ineffective in his handling of the motion to suppress.
 {¶ 44} The parties seem to agree that although the court did not issue a written decision, the court did overrule the motion from the bench at the close of the suppression hearing. Moreover, when there is no journal entry granting or denying a pre-trial motion, it is presumed to have been overruled. State ex rel. Cassels v. Dayton City School Dist. Bd. ofEducation (1994), 69 Ohio St.3d 217. Sosnoskie's motion was not ignored. A hearing was held, and the court announced its ruling. While the better practice is for the trial court to issue a written decision, we cannot conclude that trial *Page 16 
counsel failed in his duty by not seeking a written decision from the judge in this case.
 {¶ 45} Police are not required to give Miranda warnings to everyone they question, even when that questioning takes place in a police station, and the person being questioned is a suspect. State v.Biros (1997), 78 Ohio St.3d 426, 440. Instead, Miranda warnings are only required for custodial interrogations. Id. "The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Id. In making such a determination, we have considered the following factors:
 {¶ 46} "(1) What was the location where the questioning took place — i.e., was the defendant comfortable and in a place a person would normally feel free to leave? * * *;
 {¶ 47} "(2) Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);
 {¶ 48} "(3) Was the defendant's freedom to leave restricted in any way;
 {¶ 49} "(4) Was the defendant handcuffed or told he was under arrest;
 {¶ 50} "(5) Were threats made during the interrogation;
 {¶ 51} "(6) Was the defendant physically intimidated during the interrogation;
 {¶ 52} "(7) Did the police verbally dominate the interrogation;
 {¶ 53} "(8) What was the defendant's purpose for being at the place where the questioning took place? * * *;
 {¶ 54} "(9) Were neutral parties present at any point during the questioning;
 {¶ 55} "(10) Did police take any action to overpower, trick, or coerce the defendant into making a statement." State v. Estepp (Nov. 26, 1997), Montgomery App. *Page 17 
No. 16279, citations omitted.
 {¶ 56} The only factors in this list that weigh in favor of suppression are that Sosnoskie was a suspect; he was questioned in a police station; and no neutral parties were present. However, those three factors alone are not enough. See, e.g., Biros, supra, at 440-41. See, also, State v. Reeves, Greene App. No. 2002-CA-4810, 2002-Ohio-4810; State v. Abner, Montgomery App. No. 20661,2006-Ohio-4510. The remaining factors weigh in favor of a finding that the confessions were knowingly, intelligently, and voluntarily given.
 {¶ 57} Contrary to Sosnoskie's claim, the detectives did not create a situation in which he was tricked into being stranded far from home. The traffic tickets were valid, and payment of those fines was part of the questioning, even after the topic of Smith's murder was introduced. Sosnoskie willingly went to the police station; he even asked for a ride. He was not handcuffed while riding in the unmarked car, and the car did not have a cage separating the back seat from the front. Before and during the one-hour session of questioning, Sosnoskie was repeatedly told that his cooperation was voluntary, he was not under arrest, and he could ask for a ride and leave at any time. They did, in fact, return Sosnoskie to his home following the interview.
 {¶ 58} Sosnoskie remained unhandcuffed, and was otherwise unrestrained, when Ebben escorted him to an interview room, where the two talked until Ward and Daugherty arrived. Ebben introduced them and told Sosnoskie that they had a few questions about another matter. The detectives asked Sosnoskie background questions for the first half of the one-hour interview before raising the issue of Smith's murder.
 {¶ 59} The detectives were in plain clothes and sat at the table with Sosnoskie; *Page 18 
they did not position themselves between Sosnoskie and the door, which was to his right. They offered Sosnoskie refreshments and a bathroom break. The tone of the interview was conversational. Despite the seriousness of the situation, the mood seemed calm, as evidenced by Sosnoskie's body language and his cooperative attitude. Neither detective raised his voice, used profanity, or threatened or intimidated Sosnoskie in any way. Sosnoskie was not forced to answer questions. For example, the detectives accepted his refusal to discuss his prior convictions. The detectives asked open-ended questions, allowing Sosnoskie to tell his story.
 {¶ 60} For these reasons, we conclude that a reasonable person in Sosnoskie's position would have understood that he was not in custody. Therefore, Miranda warnings were not necessary, and his first confession was admissible.
 {¶ 61} Additionally, Sosnoskie's second confession was admissible. Sosnoskie relies on Missouri v. Seibert (2004), 542 U.S. 600,124 S.Ct. 2601, 159 L.Ed.3d 643, in arguing that his second confession was not admissible because it was tainted by the un-Mirandized first confession. However, this case is distinguishable from Seibert, which challenged a police practice of not advising a suspect being interrogated, who is then entitled to Miranda rights, of those rights, until after a confession is made and then promptly Mirandizing the suspect and questioning him again, with the expectation that the suspect will repeat his confession, and that this second confession, having been preceded by a recitation of the suspect's Miranda rights, will be admissible.
 {¶ 62} As explained above, Sosnoskie was not in custody when he initially confessed, and therefore, Miranda warnings were not necessary. More importantly, he was taken home following the interview rather than immediately being Mirandized and *Page 19 
questioned a second time. Sosnoskie's second confession came a number of days after the first, not minutes later as in Seibert. Because the detectives were not obliged to read Sosnoskie his Miranda warnings prior to the first confession, the absence of those warnings do not affect the voluntariness of the second confession, given several days later, after Sosnoskie waived his Miranda rights.
 {¶ 63} Sosnoskie insists that counsel was ineffective for failing to more clearly seek suppression of his second confession. From the written motion to suppress, it is unclear whether he sought suppression of one confession or both. Nevertheless, the trial court considered the motion to be applicable to both confessions. During the suppression hearing, the court asked defense counsel if he was contesting the second statements as well, to which he responded, "I just wanted to make sure that this particular warning was done. * * * And what time and conversation it covered." The court interpreted that response as an objection to the second confession and allowed the hearing to continue with the State's evidence of Sosnoskie's waiver. Even if counsel should have more clearly communicated his request, his inartful phrasing does not rise to the level of ineffective assistance of counsel.
 {¶ 64} Sosnoskie's First Assignment of Error is overruled.
 IV {¶ 65} Sosnoskie's Third Assignment of Error is as follows:
 {¶ 66} "APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 67} In his Third Assignment of Error, Sosnoskie insists that his conviction is *Page 20 
against the manifest weight of the evidence, because the State failed to prove that he purposely killed Smith. In support, he points out that the coroner was unable to specify how Smith had sustained certain injuries, and that the 76-year-old Smith was actively involved in the fight. Sosnoskie surmises that absent Smith's heart condition, about which he had no knowledge, Smith may not have died. For the following reasons, Sosnoskie's conviction is not against the manifest weight of the evidence.
 {¶ 68} When reviewing a judgment under a manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 69} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). The trial court instructed the jury: "A person acts purposely when he acts with a conscious objective to produce a specific result. To do an act purposely is to do it intentionally. * * * * The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and *Page 21 
circumstances that are in evidence."
 {¶ 70} We conclude that the jury did not lose its way in finding that Sosnoskie acted purposely when he killed Smith. The crime scene and autopsy photos, Dr. Welsh's findings and conclusions, the police testimony, and the fingerprints corroborated the details of Sosnoskie's confessions, in which he admitted to beating Smith with an object to the point that Smith was no longer moving. Moreover, the number, severity, and location of the injuries demonstrate that the intent of the then twenty-seven-year-old Sosnoskie was much more than merely to defend himself against the elderly Smith or to subdue Smith in order to rob him. Sosnoskie is no less guilty because he chose a victim who happened to be suffering from heart disease.
 {¶ 71} This is not one of those exceptional cases in which the evidence weighs heavily against conviction. Sosnoskie's conviction is not against the manifest weight of the evidence; his Third Assignment of Error is overruled.
 V {¶ 72} Sosnoskie's Fourth Assignment of Error is as follows:
 {¶ 73} "THE CUMULATIVE EFFECT OF ERRORS OCCURRING AT TRIAL DEPRIVED APPELLANT OF A FAIR TRIAL."
 {¶ 74} In his Fourth Assignment of Error, Sosnoskie offers a single, conclusory sentence arguing that he was denied a fair trial due to the cumulative effect of the errors at trial. "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." United States v. Hastings (1983), 461 *Page 22 
U.S.499, 508-9, 103 S.Ct. 1974, 76 L.Ed.2d 96. Nevertheless, multiple errors that are separately harmless may, when considered together, violate a defendant's right to a fair trial. State v. DeMarco (1987),31 Ohio St.3d 191, paragraph two of the syllabus.
 {¶ 75} The record demonstrates that Sosnoskie was not denied a fair trial. Both of his confessions were admissible; his trial counsel provided him with effective representation; and the manifest weight of the evidence supports his conviction. Even if other errors existed, those errors were harmless both cumulatively and individually.
 {¶ 76} Sosnoskie's Fourth Assignment of Error is overruled.
 VI {¶ 77} All of Sosnoskie's assignments of error having been overruled, the judgment of the trial court is Affirmed.
DONOVAN, P.J., and BROGAN, J., concur. *Page 1