[Cite as *State v. Glenn-Coulverson*, 2017-Ohio-2671.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

      Plaintiff-Appellee,               :              No. 16AP-265
                                                      (C.P.C. No. 15CR-2997)

v.                                             :

                                                      (REGULAR CALENDAR)

Nishawn Glenn-Coulverson,              :

      Defendant-Appellant.             :

D E C I S I O N

Rendered on May 4, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee. **Argued:** *Valerie B. Swanson.*

**On brief:** *Dustin M. Blake Co., LLC*, and *Dustin M. Blake*, for appellant. **Argued:** *Dustin M. Blake.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Nishawn Glenn-Coulverson, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of murder, with firearm and gang specifications; two counts of felonious assault, with firearm specifications; and two counts of having a weapon while under disability. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} In June 2015, Glenn-Coulverson was indicted on two counts of murder in violation of R.C. 2903.02, with firearm and gang specifications, unclassified felonies; two counts of felonious assault in violation of R.C. 2903.11, with firearm specifications, second-degree felonies; two counts of having a weapon while under disability in violation

of R.C. 2923.13, third-degree felonies; and one count of carrying a concealed weapon in violation of R.C. 2923.12, a forth-degree felony. Glenn-Coulverson pleaded guilty to one count of having a weapon while under disability, and elected to have the other count of having a weapon while under disability tried to the court. On the state's request, a nolle prosequi was entered for the carrying a concealed weapon count. The remaining charges were tried before a jury in February and March 2016.

{¶ 3} As pertinent to this appeal, the following facts were adduced at trial. On March 20, 2015, friends Esak Gemeraw, Omar Sow, and Zadarrick Brooks drove together to a convenience store, "De Store," on Chatterton Road in Franklin County. They arrived at the store's parking lot, which is shared with other businesses, when there was still daylight at approximately 6:00 p.m. They entered the store and soon returned to their vehicle. As they began to drive away, a gunman shot at them. Gemeraw was struck by a bullet in his torso, and he died as a result of the wound. Ten spent cartridge casings from the same firearm were found at the scene of the shooting.

{¶ 4} Sow, who was in the vehicle's rear passenger seat, testified as follows regarding the circumstances surrounding the shooting. As he, Gemeraw, and Brooks were about to enter the store, they passed a group of four or five individuals who were "just saying, just little subliminal messages so they can get our attention." (Mar. 1, 2016 Tr. at 114.) Sow was not sure exactly what those individuals were saying, but it "was like they was just rapping lyrics." (Mar. 1, 2016 Tr. at 114.) Sow described the nature of the lyrics as "[j]ust gang and some -- whole bunch of other stuff." (Mar. 1, 2016 Tr. at 114.) Sow did not know anyone in the group. Each member of the rapping group was black and was wearing either a black or gray "hoodie." After passing the rapping group, and without anyone speaking between the groups, Sow, Gemeraw, and Brooks entered the store. After exiting the store, they loaded into their vehicle, with Brooks as the driver. Gemeraw was in the front passenger seat. As Brooks began to turn out of the parking lot and left on to Chatterton Road, there were gunshots. A window of the vehicle shattered, and Gemeraw said he had been struck by a bullet. Sow heard numerous gunshots as Brooks drove away. He testified that he could not clearly see who was shooting, but he could see smoke near the shooter's hands and that the shooter was black and was wearing "all black." (Mar. 1, 2016 Tr. at 123.)

{¶ 5}  Brooks, who drove the vehicle, testified that after they purchased some snacks in the convenience store, Gemeraw and Sow exited the store before him.  Brooks exited the store approximately one minute later and met them at the vehicle.  Before the vehicle turned on to Chatterton Road, Brooks heard gunshots.  Brooks turned left into traffic and then heard Gemeraw say "I'm hit, I'm hit."  (Mar. 1, 2016 Tr. at 158.)  Brooks testified that he did not see the shooter as he drove away.

{¶ 6}  On the day of the shooting, Shalaina Hunter went to the Little Caesars in the Chatterton Road shopping plaza with her family.  She testified as follows.  As Hunter was leaving to go home, she noticed a group of three young black males loudly "rapping and just saying the 'N' word."  (Mar. 2, 2016 Tr. at 216.)  Their "pants were down low" and one was wearing black and the other two were wearing gray.  (Mar. 2, 2016 Tr. at 216-17.)  The man in black came within ten feet of her.  After Hunter left the parking lot in her vehicle, she heard gunshots and looked in her rearview and side mirrors and saw a young black male shoot multiple times.  Hunter pulled her vehicle to the side of the rode, and Brooks drove past her.  Hunter got a good look at the shooter, who she described as "a young guy, [with a] black sweatshirt, dreadlocks, brown skin, [and] jeans."  (Mar. 2, 2016 Tr. at 221.)  The shooter was one of the three rapping lyrics shortly before the shooting.  After the shooting, the other two who had been hanging out with the shooter "took off running."  (Mar. 2, 2016 Tr. at 223.)

{¶ 7}  Approximately one week after the shooting, Columbus police showed Hunter a surveillance video from inside De Store shortly before the shooting.  Hunter was able to identify the shooter in the video and in a still frame taken from the video.  The surveillance video, along with the still frame from the video, were again shown to Hunter at trial and she again identified the shooter from the video and still frame.  Finally, in the courtroom, Hunter identified Glenn-Coulverson as the shooter.

{¶ 8}  Aja Keyes was also in the Chatterton Road shopping plaza at the time of the shooting, and she testified as follows.  Keyes went into De Store for a few minutes and then exited to go to her vehicle.  She was in her vehicle when she heard a gunshot.  She turned in the direction of the gunshot and saw the shooter.  She also saw two or three individuals near the shooter run toward a housing development.  The shooter remained in his spot, "shooting towards a vehicle."  (Mar. 2, 2016 Tr. at 264.)  Keyes witnessed the

shooter fire approximately six to ten shots at the vehicle. She had a clear view of the shooter, but she could not get a good look at his face. The shooter was wearing a black hoodie and had his hair in "singles" or "dreads" down between his eyes and chin. (Mar. 2, 2016 Tr. at 269.) The individuals who ran toward the housing development were wearing "lighter hoodies, * * * gray, maybe." (Mar. 2, 2016 Tr. at 271.) Keyes was shown the convenience store surveillance video at trial and could not identify the shooter in the video, but she noted that one individual had a black hoodie and short braids like the shooter. She acknowledged however that the shooter's hairstyle and black hoodie are common.

{¶ 9} Jeffrey Gillman was walking toward the Little Caesars at the Chatterton Road shopping plaza when the shooting began. He testified as follows. When Gillman arrived at the shopping plaza, he noticed a small group "just dancing and yelling," but he could not understand what they were saying. (Mar. 2, 2016 Tr. at 289.) As Gillman stepped on to the sidewalk in front of Little Caesars, he heard gunshots. He turned and saw "a young man shooting five, six, eight times out into the street." (Mar. 2, 2016 Tr. at 290.) The shooter was wearing a "black hoodie and blue jeans and braided hair." (Mar. 2, 2016 Tr. at 292.) He described the braided hair as "[n]ot long * * * [s]hort. Shoulder length, maybe." (Mar. 2, 2016 Tr. at 292.) The others in the group, who were wearing gray hoodies, ran toward a housing development. Gillman had a clear view of the shooter.

{¶ 10} Approximately one week after the shooting, Columbus police interviewed Gillman and showed him the De Store surveillance video and then a still frame from that video. Gillman identified the shooter on the video and still frame from the video as the black male wearing a black hoodie. When asked at trial whether the shooter was in the courtroom, Gillman testified that the "defendant looks like him, but I'm - - I couldn't identify him today." (Mar. 2, 2016 Tr. at 306.) However, he had no doubt that he correctly identified the person in the video as the shooter.

{¶ 11} Shortly before the shooting, Pamela Woods arrived at the Chatterton Road shopping plaza to pick up her sons who were getting haircuts. She testified as follows. Woods was sitting in her vehicle in the shopping plaza when she saw three or four black males exiting De Store. One of the individuals wearing a gray hoodie looked similar to her nephew. One of the other individuals had "dreads" and was wearing "all black," including

a black hoodie. (Mar. 2, 2016 Tr. at 329.) The third individual was wearing a gray hoodie. Woods got a good look at the face of the individual wearing all black because he walked within approximately eight feet of her. When the individual in all black had walked near her vehicle, he was "dancing, kind of like - - almost as if he was listening to music and he was kind of just dancing around." (Mar. 2, 2016 Tr. at 346.) After the individuals walked by her vehicle, Woods heard a "pop" and then another "pop." (Mar. 2, 2016 Tr. at 333.) She exited her vehicle and saw a man shooting a firearm until he had "unload[ed] the clip." (Mar. 2, 2016 Tr. at 334.) The shooter was the individual in a black hoodie with "dreads" who had just walked past her vehicle. (Mar. 2, 2016 Tr. at 335.)

{¶ 12} Approximately one week after the shooting, Woods went to Columbus police headquarters and watched the De Store surveillance video. Woods identified the black male with a black hoodie in the video as the shooter. She also identified the black male with a black hoodie in the video still frame as the shooter. In the courtroom, Woods identified Glenn-Coulverson as the shooter.

{¶ 13} Columbus Division of Police Officer Derek Blaine testified as follows. There are multiple gangs that operate in the area of the shooting, including the Crips, James & Livingston Hot Boys, East Main Money Gang, and East Haven Bloods. As a patrol officer, Officer Blaine interacted with members of these gangs on a regular basis. Officer Blaine had numerous interactions with Glenn-Coulverson over the previous few years, and he knew Glenn-Coulverson was in the James & Livingston Hot Boys gang. Additionally, when Officer Blaine interacted with Glenn-Coulverson, Glenn-Coulverson was frequently with individuals with known ties to that gang. Many of the individuals connected with the James & Livingston Hot Boys gang have the words "Hot Boys," "James Road," or "Livingston Avenue," tattooed on their bodies.

{¶ 14} On August 11, 2013, approximately 19 months before the shooting, Officer Blaine encountered Glenn-Coulverson in connection with a traffic stop. Because there was marijuana in the vehicle, Officer Blaine and another officer at the scene required all four individuals to exit the vehicle. As he exited the vehicle, Glenn-Coulverson admitted to having two weapons on his person. The driver and two other passengers of the vehicle were all connected with the James & Livingston Hot Boys gang, and they all had "Hot Boys" tattoos to indicate their affiliation.

{¶ 15} At trial, Officer Blaine was shown the convenience store surveillance video, and he identified Glenn-Coulverson on that video. Officer Blaine also identified a known associate of the PTSQ gang, Eric Smith Ross, on the video. According to Officer Blaine, it is not unusual for individuals of different gangs to hang out together.

{¶ 16} Columbus Division of Police Detective Bill Best, a declared expert in criminal street gangs, testified as follows. For the past five years, Detective Best served in the Criminal Intelligence Unit, or Gang Unit, dealing with gangs and gang activity. Gang members use identifiers, such as wearing the same color, tattoos, and scarring, to indicate their affiliation. For example, it is common for James & Livingston Hot Boys gang members to have tattoos on their hands to indicate their affiliation with the gang. The parties stipulated that Glenn-Coulverson has "Hot Boys" tattooed on his hands and "James Road" tattooed across his torso. Detective Best testified that having these types of tattoos is "a way for people to see that you're a Hot Boy." (Mar. 2, 2016 Tr. at 395.)

{¶ 17} Detective Best also testified regarding the connection between criminal gangs and violence. He testified that criminal activity enhances a member's "street value." (Mar. 2, 2016 Tr. at 376.) "[W]hen it comes to the gang members, violence is what rules. If you're out on the street, you want to have the most violent reputation." (Mar. 2, 2016 Tr. at 377.) Committing acts of violence, such as carrying weapons and openly firing ten times at a moving vehicle, increases an individual's status on the street.

{¶ 18} Detective Best further testified that the James & Livingston Hot Boys gang is linked to the nationally recognized Bloods gang, whose members normally wear red. In the De Store surveillance video, Glenn-Coulverson can be seen wearing a red bandana in his right back pocket of his jeans. Detective Best testified that Glenn-Coulverson's display of a red bandana in the right back pocket indicated his affiliation with the Bloods gang. The color red "signifies * * * a Blood, and * * * wearing it in the right back [also] signifies a Blood." (Mar. 2, 2016 Tr. at 388.) Detective Best also acknowledged Ross' presence in the surveillance video, and he noted that he knew Ross to be an associate of the East Haven Bloods and PTSQ gangs. He testified it is not uncommon for East Haven Bloods to hang out with James & Livingston Hot Boys.

{¶ 19} Lastly, Detective Best further testified that James & Livingston Hot Boys gang members have committed felonious assaults, shootings, drug dealing, thefts, and

robberies in Columbus. For example, in February 2014, James & Livingston Hot Boys gang member Ted Vanhed was convicted of participating in a criminal street gang, two counts of aggravated robbery, and weapons charges. Additionally, in March 2015, Robert Broom, also a James & Livingston Hot Boys gang member, was convicted of involuntary manslaughter as a result of his involvement in a drive-by shooting. Detective Best testified that he had listened to an interview of Glenn-Coulverson in which he "said that [Robert Broom] was his homey * * * that he rolls with the Hot Boys." (Mar. 2, 2016 Tr. at 393.)

{¶ 20} At the conclusion of trial, the court found Glenn-Coulverson guilty of the tried count of having a weapon while under disability. The jury found him guilty of one count of murder, with firearm and gang specifications, and two counts of felonious assault, with firearm specifications. The jury found him not guilty of the other count of murder. The trial court sentenced Glenn-Coulverson to a total of 35 years to life in prison for the convictions.

{¶ 21} Glenn-Coulverson timely appeals.

## II. Assignments of Error

{¶ 22} Glenn-Coulverson assigns the following errors for our review:

[1.] The trial court abused its discretion by admitting irrelevant and prejudicial testimony by a police "gang expert," in violation of Ohio Rules of Evidence 401, 402, 403, and 404 which amounts to reversible error.

[2.] Defendant-Appellant's convictions are not supported by sufficient, credible evidence.

[3.] Defendant-Appellant's convictions are against manifest weight of the evidence.

[4.] The Defendant's right to the effective assistance of counsel was violated where counsel's performance was deficient to the Defendant's prejudice.

[5.] The trial court erred in imposing the gang specification where there was no indication that the shooting was gang related thus unconstitutionally applying R.C. 2941.142 to the Defendant.

## III. Discussion

### A. First Assignment of Error – Admission of Testimony Relating to Gang Activity

{¶ 23} In his first assignment of error, Glenn-Coulverson asserts the trial court erred in admitting into evidence testimony regarding gang activity and related conduct. Glenn-Coulverson argues that the gang-related testimony was inadmissible under Ohio Rules of Evidence 401, 402, 403, and 404 because it was irrelevant, unfairly prejudicial, and improper character evidence.

{¶ 24} The admission or exclusion of relevant evidence rests within the trial court's sound discretion. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Thus, a reviewing court will not reverse a trial court's evidentiary ruling absent an abuse of discretion that materially prejudices the affected party. *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). A trial court abuses its discretion when it acts "unreasonably, arbitrarily, or unconscionably." *State v. Barnes*, 94 Ohio St.3d 21, 23 (2002).

### 1. Relevance and Unfair Prejudice

{¶ 25} Glenn-Coulverson argues that the state was erroneously permitted to present irrelevant and unfairly prejudicial testimony concerning gangs. In particular, he contends that the trial court should not have permitted Officer Blaine and Detective Best to testify regarding gangs and gang activity. He argues that their testimony was improper because there was no evidence that the shooting was gang-related, the testimony was not probative of the shooter's identity, and the testimony was inflammatory.

{¶ 26} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, and irrelevant evidence is inadmissible. Evid.R. 402. "[T]he question of whether evidence is relevant is ordinarily not one of law but rather one which the trial court can resolve based on common experience and logic." *State v. Lyles*, 42 Ohio St.3d 98, 99 (1989).

{¶ 27} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." For the purpose of

Evid.R. 403(A), emphasis must be placed on the word "unfair" because " 'if unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable.' " *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). Thus, " '[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.' " *Id.*, quoting *Oberlin* at 172. Evidence may be unfairly prejudicial if it " 'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.' " *Id.*, quoting *Oberlin* at 172. Because fairness is subjective, the determination of whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 68 (2000).

{¶ 28} The state argues that Glenn-Coulverson failed to preserve his relevance and unfair prejudice evidentiary arguments set forth in his first assignment of error. However, even assuming these arguments were preserved for the purpose of appeal, Glenn-Coulverson fails to demonstrate the trial court committed evidentiary error regarding the gang-related testimony of Officer Blaine or Detective Best.

{¶ 29} The factual issues at trial went beyond identifying the shooter. For example, whether Glenn-Coulverson was actively participating in a criminal gang was also a relevant issue because the state was required to prove that fact to meet the requirements of the charged gang specification. As set forth above, Glenn-Coulverson was indicted on two counts of murder, with a firearm and gang specification attached to both of those counts. A gang specification under R.C. 2941.142 mandates a prison term of one, two, or three years on an offender who commits a felony "that is an offense of violence while participating in a criminal gang." Pursuant to R.C. 2941.142, to demonstrate that Glenn-Coulverson committed a felony "that is an offense of violence while participating in a criminal gang," the state needed to present evidence of the existence of a criminal gang and that Glenn-Coulverson committed a felonious act of violence while participating in that criminal gang.

{¶ 30} Regarding the existence of a criminal gang requirement of the gang specification, the state must prove that the "persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity." R.C. 2923.41(A)(3). *See State v. Johnson*, 10th Dist. No. 07AP-538, 2008-Ohio-

590, ¶ 41 (vacating the appellant's conviction on gang specification because of insufficient evidence for jury to find pattern of criminal gang activity due to absence of testimony that members of the appellant's gang committed any of the type of crimes listed in R.C. 2923.41(B)(1)); *State v. Bickerstaff*, 7th Dist. No. 09 JE 33, 2011-Ohio-1345, ¶ 58-60 (finding sufficient evidence to establish pattern of criminal gang activity based on police detective and gang member testimony outlining the felony offenses committed by members of the appellant's gang). Further, the state must demonstrate the offense of violence was committed while participating in that criminal gang. *See State v. Smith*, 6th Dist. No. L-15-1027, 2017-Ohio-776, ¶ 49-50 (finding sufficient evidence to support conclusion that the offenses were committed while the appellant participated in a criminal gang based on testimony regarding local gang culture, the appellant's affiliation with a criminal gang, and the connection between violence and gang status); *State v. Yates*, 8th Dist. No. 96774, 2012-Ohio-919, ¶ 22 (finding sufficient evidence that shooting was related to gang activity where the appellant and other criminal gang members were "patrolling their territory" in a vehicle when "they came upon the [pedestrian] victims" and the appellant "exchanged words" with one of the pedestrians before shooting). Thus, gang-related testimony is not only relevant but necessary for the state to prove a gang specification.

{¶ 31} Although the testimony of Officer Blaine and Detective Best was not relevant to the identity of the shooter, that testimony was relevant to gang specification issues, namely, whether Glenn-Coulverson shot someone while participating in a criminal gang. The testimony of Detective Best provided information for the jury regarding gang culture, and the testimony of Officer Blaine indicated Glenn-Coulverson's position within that culture. Their testimony also informed the jury regarding the James & Livingston Hot Boys gang in particular and the pattern of criminal activity exhibited by that gang. Moreover, although evidence that Glenn-Coulverson actively participated in a criminal gang was unfavorable to him, that fact did not make the gang-related evidence unfairly prejudicial when it was highly relevant to the charged gang specification.

{¶ 32} For these reasons, we find that the testimony of Officer Blaine and Detective Best was relevant and not unfairly prejudicial. Thus, the admission of their testimony was not contrary to Evid.R. 401, 402, or 403.

### 2. Other Acts Evidence

{¶ 33} Glenn-Coulverson argues that the trial court erroneously permitted Officer Blaine to testify regarding his alleged prior acts. He asserts that this testimony was admitted to prove he acted in conformity with his bad character, an impermissible basis to admit evidence of other acts under Evid.R. 404(B).

{¶ 34} Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). These listed exceptions are not exclusive. *State v. Rocker*, 10th Dist. No. 97APA10-1341 (Sept. 1, 1998), citing *State v. Smith*, 49 Ohio St.3d 137, 140 (1990). Thus, " 'other acts' evidence not fitting within the enumerated categories may be admissible so long as the evidence is admitted for any proper purpose other than proving the defendant's propensity to act and conformity with a particular trait of his character." *Id.*, citing *Smith* at 140. Thus, it is proper to admit evidence necessary to prove an element of a charged specification. *See State v. Sosnoskie*, 2d Dist. No. 22713, 2009-Ohio-2327, ¶ 33 (evidence tending to prove a necessary element of a charged crime is not excludable "other acts" under Evid.R. 404(B)); *State v. Coleman*, 85 Ohio St.3d 129, 140 (1999) (evidence tending to prove death-penalty specification was not "other acts" evidence limited by Evid.R. 404(B)).

{¶ 35} Glenn-Coulverson's Evid.R. 404(B) challenge concerns the admissibility of Officer Blaine's testimony regarding the August 11, 2013 traffic stop involving Glenn-Coulverson. Officer Blaine testified that Glenn-Coulverson was a passenger in the vehicle he stopped that day. Officer Blaine and another officer determined there was marijuana in the vehicle and directed the driver and passengers to exit the vehicle. The other officer asked Glenn-Coulverson if he had any weapons on his person, and he admitted he was carrying two weapons. Officer Blaine testified that the driver and other passengers of the stopped vehicle were also members of the James & Livingston Hot Boys gang.

{¶ 36} Before Officer Blaine testified, Glenn-Coulverson's counsel generally objected to anticipated testimony on the basis of Evid.R. 404(B). However, this was not in response to a specific inquiry by the prosecution. Even assuming Glenn-Coulverson

preserved this issue for review on appeal, he cannot demonstrate that the trial court admitted evidence in violation of Evid.R. 404(B).  The testimony regarding the traffic stop in August 2013 supported the gang specification.  Glenn-Coulverson was in the vehicle with known members of the gang, with guns and drugs, and Detective Best testified that the gang was involved in drug dealing and weapons offenses.  The testimony regarding the presence of drugs in the vehicle with Glenn-Coulverson and three other James & Livingston Hot Boys gang members generally related to the criminal activities of his gang.  Additionally, the testimony that Glenn-Coulverson was in possession of two weapons at the time of the traffic stop in August 2013 tended to show that he was an active member of the gang.  Thus, that testimony constituted evidentiary support for the charged gang specification and was not excludable as other acts evidence pursuant to Evid.R. 404(B).

{¶ 37} Accordingly, we overrule Glenn-Coulverson's first assignment of error.

### B.  Second and Third Assignments of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 38} In his second and third assignments of error, Glenn-Coulverson alleges his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.  He argues there was insufficient evidence to convict him of murder, felonious assault, and the gang specification because there was a lack of physical evidence, the eyewitness testimony was unreliable, and there was no evidence demonstrating that the shooting was gang related.  Because the evidence was sufficient to support these convictions, and the convictions were not against the manifest weight of the evidence, these assignments of error lack merit.

{¶ 39} Whether there is legally sufficient evidence to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Sufficiency is a test of adequacy.  *Id.*  The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt.  *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 40} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent,

credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 41} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 42} As set forth above, the jury found Glenn-Coulverson guilty of one count of murder, with firearm and gang specifications, and two counts of felonious assault, with a firearm specification. The trial court found Glenn-Coulverson guilty of having a weapon while under disability on the date of the shooting.[1] He argues that his other convictions should be reversed because the only evidence that he was the shooter on March 20, 2015 was unreliable eyewitness testimony, and because there was no evidence linking the shooting to gang activity.

{¶ 43} We find that sufficient evidence supported the guilty verdicts, and that those verdicts were not against the manifest weight of the evidence. The central issue raised at

---

[1] Glenn-Coulverson pleaded guilty to having a weapon while under disability at the time he was arrested, but he is not challenging that conviction on appeal.

trial was identification—namely whether Glenn-Coulverson was the shooter. Testimony revealed that at approximately one week after the shooting, eyewitnesses Hunter, Woods, and Gillman reviewed the convenience store surveillance video and a still frame from the video. At that time, all three identified Glenn-Coulverson as the shooter. At trial, both Hunter and Woods identified Glenn-Coulverson as the shooter, though Gillman could not identify the shooter in the courtroom. Keyes, another eyewitness to the shooting, reviewed the surveillance video at trial and indicated she could not positively identify the shooter in the video. However, she noted that one individual had a black hoodie and short braids like the shooter. Sow, a passenger in the targeted vehicle, could not identify the shooter, but he testified that the shooter was black and was wearing all black. Thus, multiple eyewitnesses identified Glenn-Coulverson as the shooter, before the trial and at trial. Additionally, the eyewitnesses to the shooting who could not identify Glenn-Coulverson as the shooter provided descriptions of the shooter that were consistent with the eyewitnesses who could identify him.

{¶ 44} As to Glenn-Coulverson's manifest weight argument that no physical evidence connects him to the crime, this court has concluded that a lack of physical evidence, standing alone, does not render an appellant's conviction against the manifest weight of the evidence. *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12; *see State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 ("If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other type of physical evidence does not render the conviction against the manifest weight of the evidence."). Thus, the fact that no physical evidence connected Glenn-Coulverson to the shooting did not render the verdicts against the manifest weight of the evidence.

{¶ 45} Glenn-Coulverson also challenges his convictions by critiquing the testimony of the eyewitnesses, asserting their testimony contained ambiguities, inconsistencies, and vague descriptions. However, the trier of fact saw each witness's demeanor, gestures and voice inflections, and, as such, is in the best position to determine witness credibility. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Furthermore, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens*,

10th Dist. No. 95APA09-1236 (May 28, 1996). As discussed above, the central factual issue at trial was whether Glenn-Coulverson was the shooter. While there was no physical evidence linking Glenn-Coulverson to the shooting, multiple eyewitnesses identified him as the shooter. Determining the credibility of those identifications was for the jury to decide, and Glenn-Coulverson presents no persuasive reason for this court to find that the jury lost its way in reaching its findings that Glenn-Coulverson murdered Gemeraw and committed felonious assault against Sow and Brooks.

{¶ 46} Glenn-Coulverson also contends that the evidence was insufficient to convict him of the gang specification because no evidence reasonably demonstrated a link between the shooting and gang activity. We disagree. To prove the gang specification, the state needed to show that Glenn-Coulverson committed the murder "while participating in a criminal gang." *See* R.C. 2941.142. Here, evidence demonstrated that the James & Livingston Hot Boys gang is a criminal gang and that Glenn-Coulverson was a member of that gang. There was also evidence of factual circumstances tending to show that Glenn-Coulverson engaged in the violence for a gang-related reason. Testimony indicated that, shortly before the shooting, Glenn-Coulverson and others with him were seeking attention in the shopping plaza's parking area as they rapped lyrics that included some type of gang-related message. Glenn-Coulverson displayed a red bandana in his back right jeans pocket which is an outward demonstration of his membership in a Bloods affiliated gang. Also, Glenn-Coulverson made no attempt to conceal himself as he openly fired at the vehicle within view of numerous individuals, including at least one other gang member. The convenience store's surveillance video shows that Glenn-Coulverson was hanging out with East Haven Bloods gang member Ross shortly before the shooting and eyewitness testimony puts him with the same individual at the time of the shooting. Testimony from a gang expert indicated that openly committing violence, such as by standing in a busy shopping plaza and firing ten bullets into a moving vehicle, is a means to increase status within gang culture. Collectively, evidence of these facts reasonably demonstrated that Glenn-Coulverson committed the act of murder, at least in part, for the purpose of furthering the interests of his criminal gang or his personal status within that gang. Therefore, sufficient evidence was presented at trial for the jury to find that the shooting occurred while Glenn-Coulverson was participating in a criminal gang.

{¶ 47} For these reasons, we find that sufficient evidence supported Glenn-Coulverson's convictions, and his convictions were not against the manifest weight of the evidence.  Accordingly, we overrule Glenn-Coulverson's second and third assignments of error.

### C. Fourth Assignment of Error – Alleged Ineffective Assistance of Trial Counsel

{¶ 48} Glenn-Coulverson's fourth assignment of error alleges he received ineffective assistance of trial counsel.  In order to prevail on a claim of ineffective assistance of counsel, Glenn-Coulverson must satisfy a two-prong test.  First, he must demonstrate that his counsel's performance was deficient.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This first prong requires Glenn-Coulverson to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  If Glenn-Coulverson can so demonstrate, he must then establish that he was prejudiced by the deficient performance.  *Id.*  To show prejudice, Glenn-Coulverson must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different.  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial.  *Id.* at 694.

{¶ 49} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.  Here, Glenn-Coulverson contends his trial counsel was ineffective in (1) failing to file a motion to suppress the pretrial identifications of him, (2) failing to request a jury instruction pursuant to R.C. 2933.83(C)(3), and (3) failing to request a jury instruction for the other acts testimony presented at trial.

### 1. Motion to Suppress

{¶ 50} Glenn-Coulverson argues his trial counsel should have moved to suppress testimony regarding the pretrial identifications of him as the shooter because those identifications violated his due process rights.  He argues the pretrial identifications were unduly suggestive due to the investigating authorities not complying with R.C. 2933.83,

and the circumstances surrounding the identification created a substantial likelihood of irreparable misidentification.

{¶ 51} When a claim of ineffective assistance of counsel is based on counsel's failure to file a particular motion, a defendant must show that the motion had a reasonable probability of success. *State v. Carmon*, 10th Dist. No. 11AP-818, 2012-Ohio-1615, ¶ 12. Glenn-Coulverson cannot demonstrate that a suppression motion would have been granted.

{¶ 52} Courts apply a two-prong test to determine the admissibility of identification testimony. First, there must be a determination that the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 38 (10th Dist.), citing *Neil v. Biggers*, 409 U.S. 188 (1972). Second, it must be determined that the identification itself was unreliable under the totality of the circumstances. *Id.* Pretrial identifications may be suppressed only if they are both unnecessarily suggestive and unreliable under the totality of the circumstances. *Monford* at ¶ 40. If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 31. The factors that must be considered when evaluating reliability under the totality of the circumstances test are as follows: (1) the witness's opportunity to view the offender at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the offender; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation. *Monford* at ¶ 39, citing *Biggers* at 199-200.

{¶ 53} Even if Glenn-Coulverson's counsel had moved to suppress the identifications, it would have been proper for the trial court to deny the motion because the identification procedure was not unduly suggestive. According to Glenn-Coulverson, investigative authorities failed to comply with R.C. 2933.83, resulting in unduly suggestive identification procedures. We disagree. R.C. 2933.83 governs the administration of "photo lineups" and "live lineups" and is "aimed at preventing the use of

unnecessarily suggestive procedures." *State v. Davis*, 8th Dist. No. 101502, 2015-Ohio-1144, ¶ 15.  R.C. 2933.83 "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt minimum procedures for conducting the lineups."  *State v. Thompson*, 4th Dist. No. 12CA688, 2013-Ohio-2235, ¶ 22.  R.C. 2933.83(A)(7) defines "live lineup" as "an identification procedure in which a group of persons, including the suspected perpetrator of an offense and other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator of the offense."  R.C. 2933.83(A)(8) defines "photo lineup" as "an identification procedure in which an array of photographs, including a photograph of the suspected perpetrator of an offense and additional photographs of other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator of the offense."

{¶ 54} Here, the investigative authorities did not present a photo lineup or live lineup to the eyewitnesses.  The eyewitnesses were presented with a surveillance video and a still frame from that video of activity near and immediately before the shooting.  Thus, R.C. 2933.83 was not applicable to the identification procedure used.  Furthermore, the identification procedure was not otherwise unduly suggestive.  Showing the convenience store's inside surveillance video to the eyewitnesses was a valid and reliable investigative procedure as the video depicts actual events connected in time and space to the crime itself.  *See State v. Smith*, 11th Dist. No. 91-T-4610 (Sept. 30, 1993) (noting that the rights of accused are not jeopardized when surveillance photographs of the crime itself are used as part of identification procedures).  Also, a printed still frame from the video was only shown to the witnesses who could identify the shooter in the video, which depicts numerous individuals.  The printed still frame served the functional purpose of enabling the witness to circle the shooter with a pen.  Because the pretrial identification procedures were not unduly suggestive and the trial court would not have erred in denying any motion to suppress the pretrial identifications, Glenn-Coulverson's counsel was not deficient in not moving to suppress those identifications.

### 2. Jury Instructions

{¶ 55} Glenn-Coulverson argues that his trial counsel should have requested a jury instruction pursuant to R.C. 2933.83(C)(3) and an instruction concerning other acts testimony presented at trial.

{¶ 56} Strategic and tactical decisions of trial counsel cannot form the basis of a claim of ineffective assistance of counsel. *See, e.g.*, *Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590. Because the decision not to request a particular jury instruction is a matter of trial strategy, that decision generally will not substantiate a claim of ineffective assistance of counsel. *State v. Morris*, 9th Dist. No. 22089, 2005-Ohio-1136, ¶ 100. We find no reason to deviate from this general rule in this case.

{¶ 57} Glenn-Coulverson's trial counsel's decision not to request an instruction under R.C. 2933.83 was reasonable. When there is evidence of noncompliance with the requirements of R.C. 2933.83, a trial court must "instruct the jury that such noncompliance may be considered in determining the credibility of the witness identification." *State v. Jones,* 8th Dist. No. 102318, 2015-Ohio-4694, ¶ 55, citing R.C. 2933.83(C)(3). The trial court charged the jury regarding eyewitness identification, including instructing the jury that the value of identification testimony depends on the opportunity of the witness to observe the offender, the strength of the identification, and the circumstances under which the identification was made. Glenn-Coulverson does not challenge the general eyewitness identification charge given to the jury, but asserts that his counsel should have requested the additional instruction regarding identification pursuant to R.C. 2933.83(C)(3). However, because R.C. 2933.83 was inapplicable, the trial court was not required to provide the additional R.C. 2933.83(C)(3) instruction. Thus, Glenn-Coulverson's trial counsel was not deficient in not requesting such an instruction.

{¶ 58} We are also unpersuaded by Glenn-Coulverson's argument that his counsel was deficient in not requesting a jury instruction regarding other acts testimony. The testimony regarding the August 2013 traffic stop was admissible because it supported and was offered to prove the gang specification. Furthermore, a limiting instruction regarding the testimony only being admissible in furtherance of the gang specification and not to prove the character of the defendant could have, in the view of trial counsel, unnecessarily

highlighted the existence of that evidence. Under these facts, his counsel's decision not to request a limiting instruction was within the realm of reasonable trial tactics.

{¶ 59} Accordingly, we overrule Glenn-Coulverson's fourth assignment of error.

### D. Fifth Assignment of Error – Constitutionality of Gang Specification As Applied to Glenn-Coulverson

{¶ 60} In his fifth assignment of error, Glenn-Coulverson argues that R.C. 2941.142 was unconstitutionally applied to him because there was no indication that the shooting was gang related. Glenn-Coulverson did not raise this argument in the trial court. Before Officer Blaine and Detective Best testified at trial, Glenn-Coulverson's counsel stated, "I'd just make a general motion. I realize the weight of the case law is against this, but just a general motion to the admissibility to the gang specification, the constitutionality. Also 404(B) evidence, things like that. Just make that for the record." (Mar. 2, 2016 Tr. at 355.) While Glenn-Coulverson generally challenged the constitutionality of R.C. 2941.142, the gang specification statute, in the trial court he did not challenge the statute as being unconstitutionally applied to him or give the basis for such a challenge. "A constitutional issue not raised at trial 'need not be heard for the first time on appeal.' " *State v. Douglas*, 10th Dist. No. 09AP-111, 2009-Ohio-6659, ¶ 61, quoting *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. Because Glenn-Coulverson did not raise his as applied constitutional argument regarding the gang specification in the trial court, he did not preserve this issue for appeal.

{¶ 61} Therefore, we overrule Glenn-Coulverson's fifth assignment of error.

## IV. Disposition

{¶ 62} Having overruled Glenn-Coulverson's first, second, third, fourth, and fifth assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, J., concurs.
TYACK, P.J., dissents.

TYACK, P.J., dissenting.

{¶63} I simply do not find an evidentiary basis for a gang specification in this case. I, therefore, dissent.

{¶64}   Three young African-American men were in the area of a store.  They liked rap music, perhaps even "Gansta Rap."  This tells you nothing but the fact that they were young African-American men.

{¶65}   One of the men had a red bandanna hanging out of his pocket.  This could be an indicator that he is in a so-called gang with a distant affiliation with the Los Angeles gang known as Bloods.  I worry that the mere fact certain young African-American males who like to socialize or hang out in a group made them a gang member in some minds.

{¶66}   I am not sure what qualifies someone to be considered an "expert in criminal gangs," let alone what qualifies that person to testify as to who is a member of a particular so-called gang.  A detective with the Columbus division of police felt he could testify as to the existence of the James & Livingston Hot Boys as a gang and Nishawn Glenn-Coulverson as a member.  However, Detective Best clearly testified that there were no other members of the James & Livingston Hot Boys present when the shooting occurred.

{¶67}   No one who testified at trial knew or knows why the shooting occurred.  The idea that the shooting was gang related is pure speculation, and pure speculation cannot be the basis for a criminal conviction.

{¶68}   The State of Ohio, by throwing in the gang specification, got away with putting a lot of prejudicial testimony before the jury.  The fact that Glenn-Coulverson referred to another man as a "homey" tells you nothing other than they could be considered friends.  There was no legitimate basis for the testimony that the "homey" Robert Broom was convicted of involuntary manslaughter as part of the trial of Glenn-Coulverson.  The testimony had minimal to no relevance and was highly prejudicial.  The same is true about the testimony concerning Ted Vanhed and his crimes.

{¶69}   In short, I would sustain the first and fifth assignments of error.  Because the majority does not, I dissent.

_____