[Cite as *State v. Tunstall*, 2020-Ohio-5124.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-06-090 |
| | : | O P I N I O N |
| - vs - | | 11/2/2020 |
| | : | |
| KAMERON O. TUNSTALL, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2018-09-1579

Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Arenstein & Gallagher, William Gallagher, Elizabeth Conkin, 114 E. Eighth Street, Cincinnati, Ohio 45202, for appellant

**HENDRICKSON, P.J.**

{¶1} Appellant, Kameron O. Tunstall, appeals from his convictions in the Butler County Court of Common Pleas for murder, felonious assault, and discharge of a firearm on or near a prohibited premise. For the reasons set forth below, we affirm appellant's convictions.

{¶2} On September 10, 2018, appellant was indicted on one count of murder in

violation of R.C. 2903.02(A) and one count of murder in violation of R.C. 2903.02(B), both unclassified felonies, two counts of felonious assault in violation of R.C. 2903.11(A)(1) and two counts of felonious assault in violation of R.C. 2903.11(A)(2), felonies of the second degree, and one count of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a felony of the first degree. Each count was accompanied by a firearm specification as set forth in R.C. 2941.145. The charges arose out of allegations that on August 29, 2018, while in the area of 801 South Front Street in Hamilton, Butler County, Ohio, appellant aided and abetted a codefendant, Miquan Hubbard, in Hubbard's discharge of a firearm across a street into a group of individuals. A 13-year-old boy, Jaraius Gilbert, Jr., was killed and another individual, Datorion Burns, was injured.

{¶3} Appellant pled not guilty to the charges. On April 10, 2019, ten days before appellant's trial commenced, the state filed notice of its intent to present 404(B) evidence at trial. The state indicated it "intend[ed] to introduce evidence that Defendant Kameron Tunstall and Co-Defendant Miquan Hubbard were members of a gang, and that several individuals in the group of people that were shot at were members of an opposing gang." The state indicated it would present testimony from law enforcement officers familiar with both gangs as well as testimony from lay witnesses familiar with Hubbard's and appellant's gang affiliation. The state argued such evidence was admissible under Evid.R. 404(B) and R.C. 2945.59 "to show motive, intent, planning or preparation."

{¶4} Defense counsel objected to the use of 404(B) evidence at a pretrial hearing held immediately before appellant's jury trial commenced. Defense counsel argued that the introduction of gang-related evidence was unnecessary to the state's presentation of its case and that the probative value of such evidence was substantially outweighed by danger of unfair prejudice. The trial court overruled defense counsel's objection, stating that, "[u]nless things come out differently as far as testimony is concerned from that which I

expect to come out based upon the proffer that's been given [by the state], this kind of testimony – this kind of evidence will be permitted to be used by the State in the trial today."

{¶5} At trial, the state introduced several witnesses who testified that appellant and Hubbard were members of the 30 Gang, a faction of the Blood Gang. Appellant and Hubbard posted photographs and videos of themselves flashing hand signals of the 30 Gang on Instagram, Facebook, and Snapchat.[1] Officer Johnson and Sergeant Gary Couch, both with the city of Hamilton Police Department, testified that the 30 Gang, which is also known as the KG World Gang, are rivals of another Blood Gang faction, the Piru or "Ru" Gang. Officer Johnson testified that the feud between the 30 Gang and the Ru Gang dated back a number of years to the death of a 30 Gang member, Kalif Goens, who was murdered at Doubles Bar in Hamilton in 2016. 30 Gang Members extolled Goens after his death, posting comments honoring him on social media, oftentimes using "#KG's World" or "#KG." According to their friends, appellant and Hubbard looked up to Goens.

{¶6} Sergeant Couch, a 22-year police veteran with more than a decade of experience investigating gangs in the Hamilton area, testified about the Ru Gang. He explained that since mid-2017, he has been investigating the Ru Gang by examining social media, executing search warrants, conducting drug investigations, and obtaining intel from street officers. Sergeant Couch is familiar with the Ru Gang's signs and colors and he has identified approximately 40 members of the gang. Of those 40 members, 15 have been indicted for participating in gang activities. Damone Davis, Jaije Goolsby, and Burns, three

---

1. Officer Casey Johnson testified that in addition to flashing a "B" signal for Bloods, the 30 Gang has a sign specific to their gang that the Ru Gang does not use. The 30 Gang displays a hand sign in which the index, middle, and pinky fingers are extended while the ring finger is folded down. A Snapchat video of Hubbard and appellant throwing the 30 Gang hand signal, as well as two photographs of appellant and Hubbard displaying the hand signal, were admitted into evidence. The video was posted on Snapchat about six weeks before the August 29, 2018 shooting and the photographs were taken on August 8 and 9, 2018, less than three weeks before the shooting.

individuals present at the scene of the shooting at 801 South Front Street, are members of the Ru Gang.

{¶7}   On August 29, 2018, at 4:48 p.m., less than two hours before the shooting occurred, 30 Gang member Mekhi Frierson placed a phone call from the Butler County Jail to appellant.  During the phone call, which was recorded, the two men discussed Goens being disrespected by "the ops," or the opposition, in a rap video.[2]  In the recorded phone call, appellant tells Frierson that he is with Hubbard and another friend, Terriona Jordan Schooler, who Frierson refers to as the "power crew."  Appellant tells Frierson, "Niggas talking hella shit on the snap today.  Niggas talking about fuck KG and all that.  You already know what time it is."  Appellant then tells Frierson that he saw a car parked on a street but did not approach it as he did not know who all was in the car.  Frierson responded, "We was taught that.  Don't approach no whip [car]."  Appellant responds, "I can't wait till I see him.  It's over for him."

{¶8}   Appellant's phone call with Frierson was overheard by Schooler.  Schooler had picked up Hubbard and appellant from the school they attended at the end of their respective school day.[3]  The three then drove around in Schooler's car.  At some point, appellant and Hubbard told Schooler they were upset about a rap song they heard that disparaged Goens.  Schooler then overheard appellant's portion of the conversation he had with Frierson when they discussed Goens being disrespected.

{¶9}   Schooler testified she made a number of stops while driving around the afternoon of August 29, 2018.  One of the stops she made was at appellant's home so that

---

2. Testimony elicited from friends of appellant and Hubbard indicated that the term "the ops" was often used by appellant and Hubbard to refer to Ru Gang members.

3. Schooler testified that though appellant and Hubbard are not related, she is related to both men.  She is appellant's aunt and Hubbard's cousin.  On the morning of August 29, 2018, she took both Hubbard and appellant to the high school they attended.  Hubbard's school day ended first, and she picked him up from school.  She and Hubbard returned to the school to pick appellant up at the end of his school day.

- 4 -

he could take his school items inside. Appellant was inside his home for approximately five minutes. Schooler did not recall appellant bringing anything out with him when he returned to the car. Schooler drove to a fast food restaurant to grab food for everyone before driving along Central Avenue in Hamilton. She parked her car in front of 859 Central Avenue so that appellant and Hubbard could talk to their friend "Rondo." Hubbard was sitting in the passenger seat of the car, with appellant sitting directly behind him. Rondo spoke to appellant and Hubbard along the passenger side of the vehicle for about ten minutes. Schooler claims she was not a party to the conversation and did not hear all that the men discussed. However, Schooler did hear the word "ops" mentioned. Schooler had heard Hubbard use the term "ops" in the past to refer to members of the Ru Gang.

{¶10} Around 6:00 p.m., as Schooler drove her vehicle towards her grandmother's house on Beckett Street, she drove past several members of the Ru Gang standing outside 801 South Front Street. Schooler recognized Davis, Goolsby, and Burns in the group. Schooler heard Hubbard and appellant comment to one another "the ops are outside" as she drove by. After parking at her grandmother's home, Schooler briefly went inside alone and then returned to the car at 6:15 p.m. She started driving again, with Hubbard instructing her on what roads to take.

{¶11} Hubbard had Schooler drive to Washington Street, around the corner from 801 South Front Street, and park the car. Appellant and Hubbard put on "hoodies," or hooded sweatshirts, which they had not been wearing earlier. Appellant, with the hood of his grey sweatshirt up, exited the vehicle and walked briefly towards South Front Street. He returned to the car and told Hubbard, "they [are] still there, but the little boy [is] still there." Hubbard put up the hood of his black sweatshirt, exited the vehicle, and walked with appellant down an alley towards South Front Street. Appellant then returned to Schooler's vehicle by himself. A few moments later, Schooler heard multiple gunshots. Hubbard came

running up the alley with his hood still up, jumped into Schooler's car, and told her to "pull off." Schooler drove away from the scene, eventually stopping and parking by bushes in an alley adjacent to the house at 859 Central Avenue, where she had stopped earlier in the day so that appellant and Hubbard could speak with "Rondo." Appellant got out and walked behind the vehicle before returning two minutes later. Schooler did not see a handgun or hear any mention of a handgun at any point that evening.

{¶12} After appellant got back into her car, Schooler drove everyone to a Meijer store in West Hamilton before briefly stopping at the home of Rylie Williams, Schooler's ex-girlfriend. After leaving Rylie's home, Schooler, appellant, and Hubbard smoked a marijuana blunt, stopped at a Fairfield convenience store, where they were captured on surveillance video, and then drove to a Fairfield home so that Hubbard could speak to Lora Eisenberg, his romantic interest. Hubbard exited the car to speak privately with Eisenberg for about 15 minutes. Hubbard decided to give Eisenberg his hooded sweatshirt and returned to Schooler's vehicle to ask appellant, "Do you want me to give her yours too?" After appellant said "yes," Hubbard removed a gray sweatshirt and a black sweatshirt from the trunk of Schooler's car and gave them to Eisenberg. Hubbard then got back into Schooler's vehicle and Schooler drove to Hamilton to drop appellant and Hubbard off at their respective homes.

{¶13} Immediately after the shooting at 801 South Front Street, the police were dispatched to the scene. The police found Gilbert lying on the ground with gunshot wounds to his abdomen and face. Attempts to administer CPR were futile and Gilbert died. A subsequent autopsy of Gilbert's body conducted by Dr. James Swinehart, a forensic pathologist and deputy coroner for Butler County, revealed that the gunshot wounds to Gilbert's face and abdomen were independently fatal. The bullet that entered Gilbert's face at his chin perforated the base of his skull and lacerated his brain. Dr. Swinehart was able

to recover fragments from a 9 mm bullet from Gilbert's right cerebella hemisphere. The bullet that entered Gilbert's abdomen passed through his body and exited between the eighth and ninth ribs after lacerating his liver. Dr. Swinehart testified that the nature of the wounds demonstrated that the bullets were shot from a weapon more than three feet away from where Gilbert was standing.

{¶14} Davis and Goolsby, who had both been present when the shooting occurred, were unharmed and claimed they had not seen anything. Burns ran when he heard the gunshots and was found two blocks away from South Front Street with gunshot wounds to his left clavicle and right forearm. Burns was transported to a local hospital for treatment and recovered from his injuries.

{¶15} Officers secured the scene, started collecting evidence, and began questioning potential witnesses. One individual living on South Front Street advised the officers that he heard multiple gunshots and when he looked out his kitchen window, he saw someone in a black hoodie running down the alley. This witness did not, however, see the face of the individual in the black hoodie and could not identify the runner's race or gender. Another witness, who was in a second-floor apartment next door to 801 South Front Street, also heard multiple gunshots. The witness looked out the window of the apartment and saw a black man in a black sweatshirt with his hood up and a face mask on. As the man ran by, the witness saw a black pistol in his hand. In the alley where the witnesses described the shooter standing, law enforcement collected 15 shell casing. All 15 casings were the same brand – 9 mm Luger Remington & Peters, with R&P stamped on them.

{¶16} In the days following the shooting, Hamilton police detectives followed various leads. Hubbard and appellant became suspects in the shooting and the officers tracked their movements from August 29, 2018. The officers interviewed Schooler, Rylie, and

Eisenberg. The officers learned that Eisenberg disposed of the sweatshirts that appellant and Hubbard left with her on the night of the shooting after appellant sent her a Snapchat message telling her to "get rid" of them.[4]

{¶17} From their interviews with Rylie and Schooler, officers learned that on at least two occasions in 2018 Rylie loaned appellant one of her father's firearms without her father's knowledge or permission. About a month or so before the shooting on South Front Street, Rylie gave appellant a black 9 mm Glock along with a regular magazine and an extended magazine, both containing ammunition. Rylie stated she loaned the handgun to appellant for his protection.

{¶18} In the days leading up to the August 29, 2018 shooting, Rylie asked appellant over Snapchat to return the handgun and asked Schooler to get the handgun back from appellant. From August 19, 2018 to August 29, 2018, Rylie sent Schooler seven text messages asking for the return of the handgun, including two messages on the day of the shooting. Rylie testified that despite the messages she sent asking for the handgun to be returned, she never got the handgun back from appellant. She further stated that when appellant, Hubbard, and Schooler stopped at her residence on the evening of the shooting, they stopped only to drop off cigars.

{¶19} Rylie's father, Brandon Williams, testified his black Model 17 Glock 9 mm handgun, three or four magazines, including an extended magazine, and some ammunition had gone missing from his bedroom a few weeks before the shooting. Brandon explained that he first noticed the Glock was missing on August 3, 2018. He did not report the handgun as stolen as he thought his wife may have misplaced the handgun inside their

---

4. When Eisenberg attempted to show officers the Snapchat message appellant sent directing her to "get rid of" the sweatshirts, Eisenberg discovered the message had been deleted. Testimony presented at trial indicated that a Snapchat message can be deleted by either party to a conversation – the sender or the receiver.

home.

{¶20} Officers were able to collect a box of live ammunition from Brandon's bedroom. This box contained 9 mm Luger R&P brand ammunition, which was the same brand as the casings found in the alley near South Front Street. Some of the ammunition collected from Brandon's bedroom were brass jacket ball ammunition, which was also the same kind of ammunition found in the alley. Brandon informed the officers that he had previously fired the Glock at a former rental home on River Road in Hamilton, and he recalled his grandkids picking up the casings and setting them on a tree stump in the backyard. Officers accompanied Brandon to the River Road home to see if they could collect the shell casings. Three 9 mm casings were recovered near a tree stump.

{¶21} Officers sent the 15 shell casings recovered from the alley near South Front Street and the three casings recovered from Brandon's former backyard to the Bureau of Criminal Identification and Investigation (BCI). Heather Zollman, a BCI forensic scientist with over 22 years of experience, conducted a toolmarks examination of all 18 shell casings and concluded they had been fired from the same firearm. Zollman testified that given the firing pin aperture marks on the casings, the casings were consistent with having been fired from a Glock firearm.

{¶22} On August 31, 2018, officers had Hubbard pulled out of class at his high school so that they could question him about the shooting. School attendance records indicate that after Hubbard was pulled out of class, appellant left school early and never returned. Instead, appellant enrolled in a new high school in another county.

{¶23} Following law enforcement's interview with Hubbard, Hubbard was arrested. Hamilton officers were able to obtain a download of Hubbard's Sprint cellphone. They were also able to obtain call detail records for Hubbard's cellphone, which identified, among other things, the cell towers that were used by Hubbard's phone.

{¶24} From their investigation, officers learned that the Verizon cell phone number associated with appellant had been disconnected the first business day after Hubbard was arrested. Officer's obtained appellant's cell phone records from Verizon, and these records indicated the cell phone towers used by appellant's phone. Kevin Horan, a special agent with the Federal Bureau of Investigation's (FBI) cellular analysis survey team, testified that he reviewed appellant's and Hubbard's cell phone records for August 29, 2018. Using cell site location information and mapping out the cell towers that the phones had connected to, Agent Horan was able to testify about appellant's and Hubbard's movements on August 29, 2018. Agent Horan's analysis corroborated Schooler's, Rylie's, and Eisenberg's testimony about the stops Schooler, appellant, and Hubbard made after Schooler picked up appellant from school on August 29, 2018.

{¶25} Testimony was also presented at trial that in the days following the shooting, officers executed search warrants on Hubbard's home, appellant's home, and 859 Central Avenue. From Hubbard's and appellant's respective homes, officers collected the clothing that the men had worn on the day of the shooting, absent the sweatshirts that had been disposed of by Eisenberg.[5] At 859 Central Avenue, police searched the shed on the property that was located next to the bushes where Schooler had stopped her car after the shooting. Officers recovered five pistols and one rifle; however, the officers did not recover a Glock handgun.

{¶26} Following the presentation of this evidence, the state rested its case-in-chief. Appellant moved for acquittal pursuant to Crim.R. 29, and his motion was denied.

---

5. In addition to being provided with a detailed description from Schooler of the clothing and shoes that appellant and Hubbard had worn on the day of the shooting, surveillance footage from the defendants' high school and from a Fairfield convenience store clearly depicted Hubbard's and appellant's clothing and shoes.

Thereafter, appellant rested its defense without presenting any witnesses.[6]  The jury found appellant guilty on all counts.  On May 28, 2019, after the merger of allied offenses, appellant was sentenced to an aggregate prison term of 21 years to life in prison and was classified as a violent offender pursuant to Sierah's Law, R.C. 2903.41, et seq.

{¶27}  Appellant appealed his convictions, raising eight assignments of error for review.  For ease of discussion, we will address appellant's sixth assignment of error last.

## I.  Admissibility of 404(B) "Other Acts" Evidence

{¶28}  Assignment of Error No. 1:

{¶29}  THE TRIAL COURT ERRED IN FINDING THE STATE'S PROFFERED OTHER-ACTS EVIDENCE FIT, AS A MATTER OF LAW, WITHIN AN EVID.R. 404(B) ENUMERATED CATEGORY, THEREBY DENYING [APPELLANT] HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶30}  In his first assignment of error, appellant argues the trial court erred when it allowed the state to introduce "unnecessary, irrelevant and highly prejudicial evidence [that appellant and Hubbard] were members of a gang extracting revenge on an opposing gang member."  Appellant contends evidence of his and Hubbard's affiliation with the 30 Gang was not relevant to show motive and, even if it were relevant, the probative value of the evidence was substantially outweighed by the prejudice of admitting the evidence.  With respect to the latter issue, appellant contends the trial court erred by not setting forth a detailed analysis under Evid.R. 403 before admitting the gang affiliation evidence at trial.

{¶31}  Prior to trial, the state filed a notice of its intent to present evidence in accordance with Evid.R. 404(B) that appellant and Hubbard were members of the 30 Gang and that several individuals in the group of people shot at on August 29, 2018 were

---

6. Appellant intended to call Hubbard, his codefendant, in his defense.  However, Hubbard exercised his Fifth Amendment right against self-incrimination and elected not to testify.

members of the rival Ru Gang. The state argued evidence of appellant's gang affiliation was admissible under Evid.R. 404(B) "to show motive, intent, planning or preparation" for the shooting, as well as to show the "interrelationship between people" and provide context for the crimes charged. Appellant objected to the admission of the evidence at a pretrial hearing, and the trial court ultimately ruled that the evidence would be admissible at trial. Subsequently, at trial the state was permitted, over defense counsel's objection, to introduce Officer Johnson's testimony that 30 Gang member Frierson associated with appellant, photographs taken August 8 and 9, 2018 depicting appellant and Hubbard flashing gang signs, and a Snapchat video depicting appellant flashing 30 Gang signs.

{¶32} Other witnesses for the prosecution testified about gang-related events without any objection from the defense. For instance, Sergeant Crouch and Officer Johnson testified about the rivalry of the 30 Gang and Ru Gang, which dated back to Goens' 2016 murder, and specific gang signs associated with the 30 Gang. Schooler testified about known Ru Gang members who were standing outside South Front Street on the day of the shooting and appellant and Hubbard's reference to these gang members as "the ops." Rylie testified about Snapchat messages sent between herself and appellant in which they discussed "the ops" gang member Davis, "gang shit," and "beef" appellant had with "the ops." As defense counsel failed to object to this testimony, appellant waived all but plain error. *See, e.g., State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 72.

{¶33} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime. Other-acts evidence may, however, be admissible for another non-character-based purpose, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.'" *State v. Smith*, Slip Opinion No. 2020-Ohio-4441, ¶ 36, quoting Evid.R. 404(B). "The key is that the evidence must prove something other than

the defendant's disposition to commit certain acts." *State v. Hartman*, Slip Opinion No. 2020-Ohio-4440, ¶ 22. The other acts evidence "is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id.*

{¶34} In two recently decided cases, the Ohio Supreme Court "provided a guide for courts to evaluate proposed other-acts evidence to determine whether the evidence connects to a permissible purpose without relying on any improper character references." *Smith* at ¶ 37. *See also Hartman* at ¶ 19. The first question, or the threshold question, that a court must ask itself is whether the other-acts evidence is relevant. *Id.* at ¶ 24; *Smith* at ¶ 37. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute." *Smith* at ¶ 37, citing *Hartman* at ¶ 26-27.

{¶35} "If the evidence is not premised on improper character inferences and is probative of an issue in the case," the court moves on to the next step of the analysis. *Id.* at ¶ 38. The court must then consider "whether the evidence's value 'is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.'" *Id.*, quoting Evid.R. 403(A). *See also Hartman* at ¶ 29. As other-acts evidence "'almost always carries some risk that the jury will draw the forbidden propensity inference,' courts should be vigilant in balancing the prejudicial impact of the evidence against its probative value." *Smith* at ¶ 38, quoting *Hartman* at ¶ 33. *See also United States v. Gomez*, 763 F.3d 845, 857 (7th Cir.2014).

{¶36} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) [for a nonpropensity-based issue] is a question of law." *Hartman* at ¶ 22. However, a trial court's

determination that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice is an "issue that involves an exercise of judgment" and "should be reviewed for an abuse of discretion." *Id.* at ¶ 30.

{¶37} Applying the aforementioned standard to the evidence in this case, we find that the trial court did not err in allowing the state to present the gang affiliation evidence under Evid.R. 404(B). The evidence was admissible to show motive and a plan for the shooting.

## A. Motive

{¶38} "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman*, 2020-Ohio-4440 at ¶ 48. "There need be no similarity between the other-acts evidence and the crime charged under a motive theory; 'a dissimilar prior act is just as feasible in supplying a motive for committing a crime as is a similar prior act.'" *Id.*, quoting Weissenberger, *Federal Evidence*, Section 404:16 (7th Ed.2019).

{¶39} The state's theory of the case was that appellant, a member of the 30 Gang, aided and abetted Hubbard, a fellow 30 Gang member, in shooting at rival Ru Gang members in retaliation for a rap video the Ru Gang released disparaging fallen 30 Gang member Goens. Evidence relating to appellant's gang involvement and his rivalry with known Ru Gang members was relevant and admissible to prove appellant's motive for assisting in the shooting at 801 South Front Street. *See Drummond*, 2006-Ohio-5084 at ¶ 75-76 (finding that evidence relating to a defendant's gang affiliation was relevant to showing the defendant's motive in shooting at an individual believed to belong to a rival gang); *State v. Houston*, 8th Dist. Cuyahoga No. 104752, 2017-Ohio-4179, ¶ 43-45 (finding that videos of a defendant making gang signs and text messages the defendant sent disparaging a rival gang were admissible under Evid.R. 404[B] as they were "probative of his guilt and explained his motive for the crimes – to seek revenge on a rival gang"). "A

defendant's gang affiliation can be relevant and is admissible in cases 'where the interrelationship between people is a central issue.'" *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 170, quoting *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir.1999). Evidence of a defendant's gang membership can provide "context, motive, and set-up of the crime and * * * 'make the actions of the participants understandable to the jurors.'" *Drummond* at ¶ 76, quoting *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 113.

{¶40} Here, appellant's affiliation with the 30 Gang, as well as Davis', Goolsby's, and Burns' affiliation with the rival Ru Gang, was relevant to explain why appellant provided a handgun and acted as a scout for Hubbard immediately before Hubbard fired 15 rounds from a firearm at Ru Gang members congregating at 801 South Front Street. Furthermore, testimony about 30 Gang hand signs and images of appellant making such signs were relevant to understanding appellant's membership and loyalty to the 30 Gang and aided in the jurors understanding of appellant's motive in assisting Hubbard in the shooting. We therefore find that, as a matter of law, the gang affiliation other-acts evidence was admissible for the nonpropensity-based purpose of demonstrating motive.

## B. Plan Evidence

{¶41} Additionally, we find that the jail-recording of appellant's phone call with 30 Gang member Frierson, and appellant's references to Davis, Burns, and other Ru Gang members as "the ops," was admissible 404(B) plan evidence, as it was intrinsically connected to the crimes that occurred on August 29, 2018.

{¶42} As the supreme court recently explained, "plan evidence need not share any common characteristics with the current crime; rather, the other acts are linked to the present crime because they are carried out in furtherance of the same overall plan." *Hartman*, 2020-Ohio-4440 at ¶ 40. Plan evidence "generally concerns events that are 'inextricably related' to the crime charged." *Id.* at ¶ 41, citing Weissenberger at Section

404:18. "The other acts form the 'immediate background' of the present crime; they are typically either part of the 'same transaction' as the crime for which the defendant is on trial or they are part of 'a sequence of events' leading up to the commission of the crime in question." *Id.* Plan evidence is often "'relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute.'" *Id.*, quoting McCormick, *Evidence*, Section 190, at 448-449 (2d Ed.1972).

{¶43} Appellant's phone call with Frierson and his reference to Ru Gang members as "the ops" were part of a sequence of events leading up to the shooting. Appellant's phone call with Frierson occurred less than two hours before the shooting, and on the phone call, appellant can be heard making threats after stating he was with Hubbard and Schooler and that KG had been disrespected on Snapchat. Specifically, appellant states, "You already know what time it is. * * * I can't wait till I see him. It's over for him." Appellant's statement indicated a plan for action. A plan that is later carried out when appellant sees Davis, Goolsby, and Burns, "the ops," standing in front of 801 South Front Street. Appellant and Hubbard were overheard by Schooler commenting to one another "the ops are outside" as she drove South Front Street. Less than a half-hour later, 15 shots were fired at "the ops." The jail phone call and evidence of appellant's reference to Ru Gang members as "the ops" was inextricably related to his motive in assisting Hubbard with the shooting and was therefore admissible for the nonpropensity-based purpose of showing appellant's planned participation in the criminal act.

C. Evid.R. 403(A) Analysis

{¶44} Turning to the next step in the analysis, we find that the trial court did not abuse its discretion in admitting the 404(B) evidence as the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. In so finding, we first note that Evid.R. 403(A) does not

require a trial court to explicitly state its findings regarding its application of the rule. A court is not required to state in a judgment entry that the probative value of the other acts evidence outweighs its prejudicial impact. *See State v. Froman*, Slip Opinion No. 2020-Ohio-4523, ¶ 46, citing *State v. Bey*, 85 Ohio St.3d 487, 489 (1999). Though a trial court's analysis under Evid.R. 403(A) "should be robust"; *see Hartman* at ¶ 29; "[a] trial court's failure to explicitly state its findings regarding its weighing process under Evid.R. 403(A) [is] not error." *Froman* at ¶ 46. Here, the trial court heard argument from the parties about the relevance of the gang affiliation evidence, weighed the evidence's probative value against appellant's assertions of prejudicial affect, and ultimately concluded that the evidence was admissible. Contrary to appellant's arguments, the court was not required to set forth a detailed analysis or explicitly state its findings regarding its weighing process.

{¶45} Moreover, based on the facts of this case, we cannot say that the evidence of gang affiliation was unduly prejudicial or that the trial court's decision to admit the evidence was unreasonable. While it is true that evidence of gang membership creates some risk of unfair prejudice; *see Bethel*, 2006-Ohio-4853 at ¶ 172; the state's use of the evidence was restrained. Law enforcement's testimony about the Ru Gang and 30 Gang was limited to relevant membership, the type of hand signs the 30 Gang flashed, and background on the rivalry between the two factions following Goens' death. The state did not present any testimony or evidence of illegal activity that 30 Gang members were involved in or mention any gang activities that appellant or Hubbard were known to have participated in, outside of the events that either occurred on August 29, 2018 or that were inextricably related to those events. Furthermore, with respect to the Snapchat video and two photographs that were admitted into evidence showing appellant and Hubbard flashing 30 Gang signs, the images were not inflammatory as they did not depict any illegal actions, firearms, drugs, or other images that would serve to provoke a juror's prejudice.

{¶46} Accordingly, in light of the relevance of appellant's gang affiliation and the state's minimal use of that evidence, the danger of unfair prejudice did not substantially outweigh the probative value of the gang evidence. *See Bethel* at ¶ 173. For the reasons stated above, we find that the trial court did not abuse its discretion or otherwise err in admitting evidence of appellant's gang affiliation at trial pursuant to Evid.R. 404(B). Moreover, to the extent that appellant has argued that the state erred by referencing the 404(B) gang affiliation evidence during closing statements, we find no merit to his argument. As the gang affiliation evidence was properly admitted at trial, the state was entitled to reference it during its closing statement. *See State v. Clark*, 12th Dist. Warren No. CA2007-03-037, 2008-Ohio-5208, ¶ 64. Appellant's first assignment of error is, therefore, overruled.

## II. Limiting Jury Instruction

{¶47} Assignment of Error No. 2:

{¶48} THE TRIAL COURT ERRED IN FAILING TO GIVE LIMITING INSTRUCTIONS *SUA SPONTE* REGARDING THE ADMISSIBILITY OF THE 404(B) GANG AFFILIATION EVIDENCE, AFTER OVERRULING [APPELLANT'S] ATTORNEYS' OBJECTIONS TO THE SAME, THEREBY DEPRIVING [APPELLANT] OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶49} Assignment of Error No. 4:

{¶50} THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO INSTRUCT *SUA SPONTE* THE JURY AS TO THE LIMITED PURPOSE FOR WHICH THE 404(B) GANG AFFILIATION EVIDENCE MAY BE CONSIDERED, THEREBY DEPRIVING [APPELLANT] OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶51} In his second assignment of error, appellant argues the trial court erred by failing to sua sponte provide a limiting instruction each time the court permitted the state to introduce 404(B) evidence over defense counsel's objection. In his fourth assignment of

error, appellant argues that that the trial court erred by failing to sua sponte tailor the limiting instruction it provided to the jury prior to deliberations to indicate the limited and precise purpose for which the 404(B) gang affiliation evidence could be considered.  As the two assignments of error are related, we will address them together.

{¶52}  As an initial matter we note that Crim.R. 30(A) provides that a party may not assign as error the trial court's failure to give any jury instructions "unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."  The failure to object to a jury instruction in accordance with Crim.R. 30(A) before the jury retires constitutes a waiver, absent plain error.  *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 12.  Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings.  *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).  "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise."  *State v. Biros*, 78 Ohio St.3d 426, 436 (1997).  Courts should notice plain error, "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice."  *Lynn* at ¶ 14.

{¶53}  In the present case, there is no indication in the record that defense counsel requested a limiting instruction be provided to the jury.  Defense counsel certainly did not request one be given each time his objection to 404(B) evidence was overruled.

{¶54}  The supreme court has recognized that "[a] trial court must decide whether the prejudicial effect of the other-acts testimony is such that it can be sufficiently mitigated by a well-tailored limiting instruction or, to the contrary, whether the effect of the testimony is so prejudicial that no instruction can temper its sway."  *Hartman*, 2020-Ohio-4440 at ¶ 66.  If a party requests a limiting instruction, the court must give one.  *Id.* at ¶ 67, citing Evid.R. 105.  However, a court is not required to "sua sponte issue such an instruction any

time other-acts evidence is used. Depending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury." *Id.*, citing *State v. Schaim*, 65 Ohio St.3d 51, 61 (1992), fn. 9. As appellant did not request that a limiting instruction be given each time his objection to 404(B) evidence was overruled, and the trial court was not required to sua sponte provide one, we find the trial court did not commit plain error in electing not to give a limiting instruction each time it admitted 404(B) evidence at trial. *See id*; *Drummond*, 2006-Ohio-5084 at ¶ 78. Appellant's second assignment of error is, therefore, overruled.

{¶55} As for appellant's fourth assignment of error, we find that the limiting jury instruction provided to the trial court did not amount to plain error. Appellant did not offer his own limiting jury instruction to the court and he did not object when the following instruction was given to the jury prior to its deliberation:

> Evidence of other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with that character. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> During the trial, evidence was admitted that, if believed, would indicate other crimes, wrongs, or acts of the Defendant. This evidence was not admitted to prove the character of the Defendant in order to show that he acted in conformity with that character in the events related to the charged offenses. The evidence was admitted, and you may consider it only for the purpose – excuse me – of providing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶56} While the jury instruction provided by the court was substantially similar to the language set forth in the *Ohio Jury Instructions*, CR Section 401.25, we acknowledge that the limiting instruction was overly broad, in that it listed multiple purposes for which the evidence could be considered that were not relevant to this case. As the Ohio Supreme

Court recently held, "[t]o tell a jury that a certain piece of evidence may be considered as evidence of 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,' Evid.R. 404(B), imparts nothing meaningful and is akin to telling the jurors that the evidence may be considered for any purpose." *Hartman* at ¶ 69. While the boilerplate language contained in the *Ohio Jury Instructions* addressing other-acts evidence is a starting point, a trial court should tailor the instruction to the specific purpose for which the other-acts evidence was admitted at trial. *Id.* at ¶ 70. Therefore, "going forward courts should tailor their instructions to the particular uses that are relevant to the case and explain to jurors in plain language the permissible and impermissible inferences that may be drawn from the other-acts evidence." *Smith*, 2020-Ohio-4441 at ¶ 51, citing *Hartman* at ¶ 70.

{¶57} Despite the fact that the limiting jury instruction provided in this case was overly broad, we find that it does not amount to plain error. In reaching this conclusion, we are guided by the supreme court's recent decision in *Smith.* There, 404(B) evidence was admitted by the trial court to show lack of mistake, preparation, and planning." *Id.* at ¶ 16. However, when providing its final instructions to the jury, the trial court instructed the other-acts evidence was to be considered "only for the purpose of deciding whether it proves the Defendant's motive, opportunity, intent or purpose, preparation and/or plan to commit the offense charged in this trial." *Id.* at ¶ 17. The defendant did not object to the limiting instruction, and he was subsequently convicted of gross sexual imposition and disseminating material harmful to a juvenile. *Id.* at ¶ 18. His convictions were upheld by the appellate court and the supreme court, the latter of which specifically addressed the limiting instruction provided to the jury. *Id.* at ¶ 18 and 51. The supreme court held that though the trial court's instruction was overly broad in that it listed multiple purposes for which the 404(B) evidence could be considered that were not relevant to the case, the

instruction did not amount to plain error as "defense counsel did not object to the language used by the court, and the instruction largely tracked the model one in the *Ohio Jury Instructions.*" *Id.* at ¶ 51. As the jury instruction provided in this case was also not objected to by appellant or his counsel and the instruction was substantially similar to the model instruction set forth in the *Ohio Jury Instructions*, we conclude that the trial court's instruction did not constitute plain error. Appellant's fourth assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶58} Assignment of Error No. 3:

{¶59} [APPELLANT'S] ATTORNEYS WERE INEFFECTIVE IN FAILING TO REQUEST LIMITING INSTRUCTIONS REGARDING THE ADMISSIBILITY OF 404(B) GANG AFFILIATION EVIDENCE, THEREBY DEPRIVING [APPELLANT] OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL.

{¶60} Assignment of Error No. 5:

{¶61} [APPELLANT'S] ATTORNEYS WERE INEFFECTIVE IN FAILING TO SUBMIT A PROPOSED JURY INSTRUCTION ON THE LIMITED USE OF THE 404(B) GANG AFFILIATION EVIDENCE, THEREBY DEPRIVING [APPELLANT] OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL.

{¶62} In his third assignment of error, appellant argues his trial counsel provided ineffective assistance by failing to request that the trial court provide a limiting instruction immediately after the court permitted the 404(B) gang affiliation evidence to be admitted at trial. In his fifth assignment of error, appellant argues his trial counsel provided ineffective representation by failing to request a narrowly tailored limiting instruction that the gang affiliation evidence was relevant only to show appellant's motive in aiding and abetting Hubbard in the shooting. As the two assignments of error are related, we will address them together.

{¶63} "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989) and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.*, citing *Bradley* at paragraphs two and three of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694. The failure to satisfy either the deficiency prong or the prejudice prong of the test is fatal to a claim of ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶64} As this court has previously recognized, "the failure to seek a limiting instruction does not in and of itself indicate ineffective assistance of counsel." *State v. Cunningham*, 12th Dist. Butler No. CA2017-03-034, 2018-Ohio-912, ¶ 26, citing *State v. Cox*, 12th Dist. Butler No. CA2005-12-513, 2006-Ohio-6075, ¶ 30. "[N]ot requesting a limiting instruction is sometimes a tactical [decision], and we do not wish to impose a duty on the trial courts to read this instruction when it is not requested." *State v. Schaim*, 65 Ohio St.3d 51, 61, fn. 9 (1992).

A.  Limiting Instruction When Evidence First Introduced

{¶65} In this case, defense counsel may have decided that requesting a limiting instruction every time gang evidence was admitted at trial would draw undue attention to the evidence. *See, e.g., State v. Glenn-Coulverson*, 10th Dist. Franklin No. 16AP-265, 2017-Ohio-2671, ¶ 58. "There is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Cunningham* at ¶ 25, quoting

*Strickland* at 689. "[E]ven debatable trial tactics and strategies do not establish ineffective assistance of counsel." *Id.* Defense counsel's decision not to request a limiting instruction each time 404(B) evidence was admitted at trial, therefore, did not constitute deficient performance. Appellant's third assignment of error is overruled.

### B. Limiting Instruction During Final Jury Instructions

{¶66} Defense counsel's failure to request a more narrowly tailored limiting instruction regarding the gang affiliation evidence be given in the court's final jury instructions is troubling. As discussed in our resolution of appellant's fourth assignment of error, the limiting instruction provided to the jury was overly broad and set forth all possible permissible uses for 404(B) evidence: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." As the supreme court recognized in *Hartman*, a broad instruction like this does very little to assist the jury in determining the proper purposes for which other-acts evidence may be considered. *Hartman*, 2020-Ohio-4440 at ¶ 69.

{¶67} We can think of no tactical reason why defense counsel would not have sought a more narrowly tailored instruction. In his closing argument, defense counsel referenced the limiting instruction and tied the instruction and gang affiliation evidence to proof of motive, stating:

> [W]e have heard a lot in this case about gang affiliation. And there is an instruction that was already read to you by [the] Judge * * * as to any other crimes, evidence or other crimes, wrongs, or acts. And in the middle of that paragraph, it says, "This evidence was not admitted to prove the character of the Defendant or to show that he acted in conformity with that character in the events related to the charted offense. This evidence was admitted, and you may consider it only for certain purposes."
>
> * * *
>
> [Y]ou have to decide if that evidence has any weight or, if it has

weight, what weight does it have, what purpose does it have, in deciding ultimately, motive to commit this crime and whether Mr. Tunstall was complicit in the shooting that resulted in the death of Jaraius Gilbert, Jr. and Datorion – the shooting of Datorion Burns.

Counsel could have, and should have, sought a more narrowly tailored instruction in this case.

{¶68} Nonetheless, given the record before us, we conclude that defense counsel's failure to request a more narrowly tailored limiting instruction did not amount to ineffective assistance of counsel as appellant cannot demonstrate any prejudice. The state presented overwhelming evidence of appellant's complicity to murder, felonious assault, and discharge of a firearm on or near a prohibited premise. In addition to the gang affiliation evidence, which supplied appellant's plan and motive in participating in the shooting, the state demonstrated that appellant provided the handgun Hubbard used in the shooting. The state presented evidence that Rylie loaned appellant a Glock 9 mm handgun and ammunition prior to the shooting, appellant ignored Rylie's requests to return the handgun, and the 15 shell casings recovered from the scene of the shooting were consistent with being fired from a Glock firearm and matched three casings from the handgun's previous firing at Rylie's father's former home.

{¶69} In addition to the firearm testimony, evidence was presented that appellant acted as a scout for Hubbard immediately before the shooting began. After appellant confirmed that Ru Gang members were still standing in front of 801 South Front Street, appellant walked Hubbard down the alley and returned to Schooler's vehicle mere seconds before Hubbard opened fire. Then, after the shooting, appellant fled from the scene in the same car as Hubbard, making a stop at 859 Central Avenue to dispose of the handgun and a stop at Eisenberg's home to dispose of the hooded sweatshirts he and Hubbard had worn when the shooting occurred. Appellant later sent Eisenberg a message asking her to "get

rid" of the sweatshirts, thereby destroying evidence relevant to his crimes. Finally, the state presented cell site location information and data from appellant's cell phone records that tracked appellant's movements on the day of the shooting and demonstrated that his movements mirrored those of Hubbard's, thereby placing appellant with Hubbard at every stage of the crime.

{¶70} Given the overwhelming evidence establishing that appellant aided and abetted Hubbard in the commission of murder, felonious assault, and discharge of a firearm on or near a prohibited premise, we cannot say defense counsel asking for a more specific limiting instruction would have resulted in a different outcome at trial. The gang affiliation evidence admitted at trial provided an explanation, or motive, for appellant's conduct in assisting Hubbard with the shooting, but it was appellant's own actions on the day of the shooting that demonstrated his complicity in the charged offenses. In this case, where there was a restrained use of the gang affiliation evidence, the absence of a narrowly tailored jury instruction did not have a prejudicial effect on appellant's right to a fair trial.[7] Accordingly, for the reasons stated above, we overrule appellant's fifth assignment of error.

### IV. Manifest Weight and Sufficiency of the Evidence

{¶71} Assignment of Error No. 7:

{¶72} [APPELLANT'S] CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE VACATED.

{¶73} Assignment of Error No. 8:

{¶74} WHERE [APPELLANT'S] CONVICTIONS WERE BASED ON LEGALLY

---

7. As set forth in our discussion of appellant's first assignment of error, the state did not present any testimony or evidence of illegal activity that 30 Gang members were involved in or mention any gang activities that appellant or Hubbard were known to have participated in, outside of the events that occurred on August 29, 2018. The gang affiliation evidence was restrained to testimony about relevant members in the Ru Gang and 30 Gang, the type of hand signs 30 Gang members flashed, and background on the rivalry between the two factions following Goens' death. The limited nature 404(B) gang affiliation evidence permitted at trial helped reduce the risk of unfair prejudice. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 172-173.

INSUFFICIENT EVIDENCE, [APPELLANT] WAS DENIED DUE PROCESS OF LAW, AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

{¶75} In his seventh and eighth assignments of error, appellant argues that his convictions for murder, felonious assault, and discharge of a firearm on or near a prohibited premise are against the manifest weight of the evidence and are not supported by sufficient evidence. Appellant maintains that the state failed to present proof beyond a reasonable doubt that he aided and abetted Hubbard in the commission of the aforementioned crimes. He further contends that the jury "got caught up" in the state's gang evidence and lost its way when it convicted him of all charges.

{¶76} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶77} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and

all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶78} Appellant was convicted of complicity to murder, felonious assault, and discharge of a firearm on or near prohibited premises. "A charge of complicity may be stated in terms of [the complicity statute] or in terms of the principal offense." R.C. 2923.03(F). *See also State v. Herring*, 94 Ohio St.3d 246, 251 (2002). Pursuant to the complicity statute, "[n]o person, acting with the kind of culpability required for the commission of an offense shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2).

{¶79} Appellant was convicted of murder in violation of R.C. 2903.02(A) and (B), which provides, respectively, that "[n]o person shall purposely cause the death of another" and that "[n]o person shall cause the death of another as a proximate result of the offender

committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."  The offense of violence appellant committed was felonious assault in violation of R.C. 2903.11(A)(1) and R.C. 2903.11(A)(2).  Pursuant to R.C. 2903.11(A)(1) and (2), "[n]o person shall knowingly (1) [c]ause serious physical harm to another * * * [or] (2) [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."  Finally, appellant was convicted of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), which provides that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway."[8]

{¶80}  To be complicit to a crime by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."  *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus.  "[A] person's mere association with a principal offender is not enough to sustain a conviction based upon aiding and abetting."  *State v. Coldiron*, 12th Dist. Clermont Nos. CA2003-09-078 and CA2003-09-079, 2004-Ohio-5651, ¶ 17.  The accused "must actively participate in some way and contribute to the unlawful act to aid or to abet."  *State v. Davis*, 12th Dist. Madison No. CA2015-05-015, 2016-Ohio-1166, ¶ 49, citing *State v. Salyer*, 12th Dist. Warren No. CA2006-03-039, 2007-Ohio-1659, ¶ 27.  Aiding and abetting may be shown through either direct or circumstantial evidence, and "'participation in criminal intent may be inferred from the presence, companionship, and conduct before and after the offense is committed.'"  *In re B.T.B.*, 12th Dist. Butler No. CA2014-10-199, 2015-Ohio-2729, ¶ 19, quoting *State v.*

---

8. Appellant was also convicted of the R.C. 2941.145 firearm specifications that accompanied each charge in the indictment.  Appellant has not specifically challenged his convictions on the underlying firearm specifications.  Nonetheless, we find that his convictions on the firearm specifications were not against the manifest weight of the evidence and were supported by sufficient evidence, as the state demonstrated a firearm was used to facilitate the criminal offenses of murder, felonious assault, and discharge of a firearm on or near prohibited premises.

*Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, ¶ 29 (8th Dist.).

{¶81} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find appellant's convictions for murder, felonious assault, and discharge of a firearm on or near prohibited premises are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. The state established that appellant was not only with Hubbard on the day of the shooting, but that he shared Hubbard's criminal intent and was an active participant in the shooting that killed Gilbert and seriously harmed Burns. The state proved that appellant aided and abetted in the commission of the crimes by procuring the firearm used in the shooting, by acting as a scout immediately before the shooting, and by having evidence related to the shooting destroyed in the days after the crime was committed. Appellant's statements and actions on August 29, 2018 also proved that he shared the same criminal intent as Hubbard and that he, like Hubbard, was motivated to obtain revenge against those who disrespected Goens.

{¶82} Schooler's testimony and the recorded jail phone call between Frierson, a 30 Gang member, and appellant demonstrated that appellant was angry and upset about the disparaging rap video. Less than two hours before the shooting, appellant can be heard discussing the rap video and indicating his plan to take action against those who circulated the video. Appellant states, "Niggas talking hella shit on the snap today. Niggas talking about fuck KG and all that. You already know what time it is. * * * I can't wait till I see him. It's over for him."

{¶83} Schooler's testimony and cell site location information placed Hubbard and appellant at the scene of the shooting. Schooler overheard appellant and Hubbard mention to one another "the ops are outside" as she drove by South Front Street where Davis,

Goolsby, and Burns, known Ru Gang members, were standing.  After Schooler parked around the corner from 801 South Front Street, appellant, with the hood of his hooded sweatshirt up, got out of the vehicle and walked towards South Front Street.  When he returned, Schooler overheard appellant tell Hubbard, "they [are] still there, but the little boy [is] still there."  Appellant then walked with Hubbard down an alley towards South Front Street.  Appellant returned on his own to Schooler's vehicle.  Moments later, multiple gunshots were heard by Schooler and individuals residing near 801 South Front Street.  The shots fired from the alley crossed the public road and struck Gilbert in the face and abdomen, causing his death.  Burns also suffered serious physical harm, as he was shot in his left clavicle and right forearm.  After the shots were fired, Hubbard came running up the alley in his hooded sweatshirt, jumped in Schooler's vehicle, and told Schooler to "pull off."

{¶84}  The 15 shell casings that were recovered from the alleyway where Hubbard fired the shots were 9 mm Luger Remington & Peters.  This is the same type of ammunition that was recovered from Rylie's father's home.  Testimony from Rylie and Schooler established that Rylie had loaned a Glock 9 mm handgun, with a regular magazine and extended magazine full of ammunition, to appellant in the weeks leading up to the shooting.  Though Rylie sought to have the firearm returned to her before the shooting occurred, appellant never returned the handgun.  A toolmarks examination of the 15 casings recovered from the scene and three casings recovered from Rylie's father's former home, where he shot the Glock 9 mm, demonstrated that all 18 casings had been fired from the same firearm.

{¶85}  Evidence was also presented that appellant took steps to conceal his and Hubbard's crimes.  Immediately after the shooting, Schooler drove away from the scene and stopped her vehicle at 859 Central Avenue near some bushes.  Schooler explained appellant briefly exited the car, leading to an inference that appellant disposed of the Glock

9 mm handgun at this time. Appellant and Hubbard sought to hide the sweatshirts they were wearing at the time of the shooting by giving them to Eisenberg. Appellant later contacted Eisenberg and asked her to destroy the sweatshirts.

{¶86} Appellant also took steps to try to hide his involvement in the crimes and to distance himself from Hubbard after Hubbard's arrest. The same day that Hubbard was questioned by police at the high school appellant and Hubbard both attended, appellant checked himself out of school early and never returned. Appellant enrolled in a new school in a different county. Appellant also had his Verizon cell phone number disconnected the first business day after appellant's arrest.

{¶87} Given the overwhelming amount of evidence presented by the state establishing that appellant actively participated and aided Hubbard in the shooting that occurred at 801 South Front Street, we find that appellant's convictions for murder, felonious assault, and discharge of a firearm on or near prohibited premises are supported by sufficient evidence and are not against the manifest weight of the evidence. The trier of fact did not lose its way or create such a manifest miscarriage of justice that appellant's convictions must be reversed. We therefore overrule appellant's seventh and eighth assignments of error.

### V. Cumulative Error

{¶88} Assignment of Error No. 6:

{¶89} THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULINGS DENIED [APPELLANT] HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶90} In his sixth assignment of error, appellant argues that he received an unfair trial based on the number of alleged evidentiary errors that occurred during the course of the trial. Appellant contends his convictions should be reversed and a new trial ordered

because the trial court (1) erroneously admitted 404(B) gang affiliation evidence and (2) erroneously admitted hearsay testimony from Rylie and Schooler about text messages they sent one another regarding the handgun Rylie loaned to appellant.

{¶91} Pursuant to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. McClurkin*, 12th Dist. Butler No. CA2007-03-071, 2010-Ohio-1938, ¶ 105. In order for the cumulative error doctrine to apply, "an appellate court must first find that multiple errors, none of which individually rose to the level of prejudicial error, actually occurred in the court." *State v. Cramer*, 12th Dist. Butler No. CA2003-03-078, 2004-Ohio-1712, ¶ 67, citing *State v. DeMarco*, 31 Ohio St.3d 191, 197 (1987).

## A. 404(B) Evidence

{¶92} As we discussed in or resolution of appellant's first assignment of error, the trial court did not err in admitting evidence of appellant's gang affiliation under Evid.R. 404(B), as such evidence was admissible to show motive and a plan for the shooting. The admission of 404(B) evidence, therefore, cannot stand as a basis for a finding of cumulative error.

## B. Evidence Regarding Text Messages

{¶93} The only other error appellant asserts in support of his cumulative error argument relates to the trial court's admission of text messages, and testimony relating to those text messages, from Rylie and Schooler about the handgun Rylie loaned appellant.[9]

---

9. Appellant did not raise the alleged improper admission of the text messages and testimony about the text messages as an independent assignment of error. Rather, appellant raised the issue for the first time under a cumulative error argument.

Appellant argues the trial court erred when it admitted, over defense counsel's objection, messages the two women exchanged during the month of August 2018 regarding the handgun. Appellant contends Rylie's and Schooler's testimony about the text messages constitute inadmissible hearsay and he argues that neither the testimony nor the text messages should have been admitted into evidence.

{¶94} The record reflects that Schooler and Rylie each testified about text messages they personally sent to one another concerning Rylie getting the handgun back from appellant. The text messages consisted of Rylie expressing that she wanted the handgun returned and her asking Schooler to ask appellant to return it. In her texts to Rylie, Schooler asks if Rylie talked to appellant about getting the handgun back, asks whether Rylie was able to get the weapon back, and indicates that she will speak to appellant about getting it returned to Rylie. Defense counsel objected to the admission of the text messages and to Rylie's and Schooler's testimony about the text messages on the basis that such evidence constituted inadmissible hearsay. The state argued the hearsay exception set forth in Evid.R. 803(3) applied and that the testimony and exhibits were admissible to show the declarant's then existing state of mind. The trial court agreed with the state and overruled defense counsel's objection.

{¶95} The admission of evidence rests within a trial court's discretion and such decisions will not be reversed absent an abuse of discretion. *State v. Turner*, 12th Dist. Brown No. CA2019-05-005, 2020-Ohio-1548, ¶ 31. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally inadmissible in court unless it falls within one of the permissible hearsay exceptions. *See* Evid.R. 802.

{¶96} One hearsay exception is set forth in Evid.R. 803(3) for a "then existing mental, emotional, or physical condition." Under this exception,

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Evid.R. 803(3). The exception applies regardless of whether the declarant is available as a witness. *Id.*

{¶97} We find that the trial court did not abuse its discretion in admitting the texts and testimony about the texts under Evid.R. 803(3) as the texts demonstrated the declarant's then existing state of mind or intent to take action. *See, e.g., State v. Simpson*, 1st Dist. Hamilton No. C-100789, 2011-Ohio-4578, ¶ 23-25. The text messages and testimony about said text messages reflect Rylie's state of mind in wanting the handgun she loaned appellant returned as well as Schooler's state of mind and intent to contact appellant about the handgun. For these purposes, the testimony and messages were relevant and properly admitted.

{¶98} Furthermore, even if admission of the text messages as exhibits was error, the error was harmless given that it was cumulative of Schooler's and Rylie's trial testimony. Apart from being asked about the specific text messages the two women sent, each woman testified that Rylie loaned appellant a firearm, that Rylie sought to have the firearm returned prior to the shooting that occurred on August 29, 2018, that the women individually contacted appellant regarding the return of the handgun, and that appellant never returned the firearm to Rylie. Therefore, even if it was error to admit the text messages and allow testimony from each woman concerning the specifics of the text messages, the error was harmless.

{¶99} Within his argument concerning the admission of the text messages and testimony relating to the text messages, appellant asserts that the state went beyond the

permissible purposes of Evid.R. 803(3) during closing arguments. Appellant contends the state impermissibly used the text messages to prove the truth of the matter asserted - that appellant had not returned the handgun by the time of the August 29, 2018 shooting. Appellant points to statements made by the prosecutor in closing arguments regarding the text messages.

{¶100} We note that appellant did not object to the prosecutor's use of the text messages during closing argument. Additionally, appellant has not set forth an assignment of error alleging prosecutorial misconduct in his appellate brief. To the extent that appellant is trying to raise a claim of prosecutorial misconduct within his sixth assignment of error, we decline to address the issue for noncompliance with App.R. 16(A)(7). This rule provides that an appellant's brief "shall include * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(7). As appellant failed to separately argue prosecutorial misconduct in his brief or cite to case law or any other authorities that would support a claim of prosecutorial misconduct, we decline to address the issue. *See* App.R. 12(A)(2).

{¶101} Accordingly, having found no error in the admission of the 404(B) evidence or the text message evidence, we conclude that appellant was not deprived of a fair trial and that the cumulative error doctrine is inapplicable. Appellant's sixth assignment of error is overruled.

{¶102} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.